# IN THE SUPREME COURT OF IOWA

No. 07–0221

Filed March 5, 2010

**BELL BROTHERS HEATING AND AIR CONDITIONING**
and **ST. PAUL FIRE AND MARINE INSURANCE COMPANY,**

Appellants,

vs.

**ROBERT GWINN,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

Employer seeks further review of court of appeals decision affirming district court's affirmance of an award of workers' compensation benefits to an employee. **DECISION OF COURT OF APPEALS VACATED; DECISION OF DISTRICT COURT REVERSED AND CASE REMANDED.**

Patrick V. Waldron of Patterson Law Firm, L.L.P., Des Moines, for appellants.

Martin J. Ozga (until his withdrawal), Jean M. Mauss, and Max J. Schott of Max Schott and Associates, P.C., Des Moines, for appellee.

**CADY, Justice.**

In this appeal from a decision by the district court affirming an award of benefits and an order for alternative medical care by the workers' compensation commissioner following a contested case hearing, we primarily consider the proof required by the employee to establish a claim for benefits and expenses on account of medical care obtained by the employee, but not authorized by the employer or the commissioner. The district court and court of appeals affirmed the award for benefits made by the commissioner. On our review, we vacate the decision of the court of appeals, reverse the decision of the district court, and remand the case to the district court for an order for remand to the workers' compensation commissioner for further proceedings.

## I. Background Facts and Proceedings.

Robert Gwinn dismounted a ladder on April 25, 2001, while working as a heating and cooling technician for Bell Brothers Heating and Air Conditioning and injured his left Achilles tendon. On May 9, 2001, he was examined by Dr. Lee Evans, a podiatrist. Dr. Evans diagnosed Gwinn with Achilles tendinitis based on his physical examination of Gwinn and his review of x-rays. Gwinn was released for work, but was restricted from using a ladder. Over the course of the next four years, however, Gwinn continued to experience periodic problems with his left ankle.

On May 14, 2001, Gwinn was examined by Dr. Robert Eells, a podiatrist, after experiencing a popping sensation in his left foot while walking. He eventually underwent a triple-phase bone scan. The scan was normal in all phases, including the first phase directed to soft-tissue injuries. Dr. Eells concluded Gwinn sustained no permanent impairment. He anticipated Gwinn would require no further medical treatment.

In June 2002, Gwinn was seen by Dr. Eells for pain in his left heel. He experienced this pain while driving a truck with a manual transmission. Gwinn was employed by a different employer at the time, but working in the same field. Dr. Eells eventually ordered an MRI of the left heel. The MRI report revealed the heel was normal.

In April 2003, Gwinn was seen by Dr. Jacqueline Stoken, M.D. and Dr. Bruce Pichler on consecutive days for continuing pain and discomfort in his left heel. Gwinn had obtained an attorney by this time and was referred to Dr. Pichler by his attorney. Gwinn was seen by Dr. Stoken at the request of Dr. Eells and the workers' compensation carrier for the employer.

Dr. Stoken believed Gwinn suffered from Achilles tendinitis. Dr. Pichler, a podiatrist, formed an impression that Gwinn suffered from chronic tendinitis, aggravated by Haglund's deformity. He acknowledged the previous objective tests conducted by other physicians who had examined Gwinn revealed no abnormal findings. Yet, Dr. Pichler observed Gwinn had a difficult time responding to his requests to raise his left heel as compared to his right heel. In his office notes, Dr. Pichler recommended two forms of treatment. He recommended Gwinn be placed in a cast for six weeks. In the event this treatment was unsuccessful, Dr. Pichler recommended surgery be performed to "consider a resection of the posterior/superior aspect of the calcaneus with possible superior translocation of the Achilles tendon to further decrease the tension on the Achilles tendon fibers." Without additional therapy or treatment, Dr. Pichler believed Gwinn had reached maximum medical improvement.

On May 20, 2003, Dr. Pichler wrote Gwinn's attorney. This letter was a response to a letter from Gwinn's attorney and provided a different diagnosis than the tendinitis documented in his office notes following his initial examination. He opined, based on his review of the prior records and

his examination, Gwinn suffered a "partial disruption of the fibers of his left Achilles tendon." Dr. Pichler found "pinpoint discomfort at the Achilles tendon insertion" during his physical examination to support his diagnosis of a "partial disruption." Dr. Pichler also indicated Gwinn had reached maximum medical improvement and, based on his office examination, found he suffered a twenty-four percent impairment of the foot. Dr. Pichler recommended Gwinn be placed in a cast for six weeks, followed by therapy and possible surgery.

In June 2003, counsel for Gwinn made a request to the workers' compensation carrier for Bell Brothers to pay for the treatment recommended by Dr. Pichler. Gwinn considered the examination conducted by Dr. Pichler to be an independent medical evaluation and requested alternative medical care be provided. The insurance carrier informed Gwinn that Dr. Pichler was not an authorized physician. It authorized Gwinn to see an orthopedic physician specializing in ankle and foot care.

Gwinn was eventually seen by Dr. Joseph Galles, M.D. on February 10, 2004. Dr. Galles diagnosed Gwinn with tendinitis. He found the Achilles tendon to be strong and intact with no relative weakness in the foot and ankle. Dr. Galles recommended physical therapy. The insurance carrier rejected physical therapy on the grounds that Gwinn had previously received such treatment.

Gwinn filed a petition for workers' compensation benefits based on the April 25, 2001 injury. The petition was filed on April 13, 2004.

In August 2004, the insurance carrier authorized Gwinn to obtain additional treatment with Dr. Galles, after Gwinn complained of continuing problems. Gwinn also wanted to proceed with Dr. Pichler's recommendations.

Gwinn made, but failed to keep, an appointment with Dr. Galles. Instead, he was seen by Dr. Pichler on November 10, 2004. Dr. Pichler performed an ultrasound test in his office and determined the ultrasound "clearly indicate[d] a tear" of the Achilles tendon "at the distal insertion just as it approaches the calcaneus." In a later written report, Dr. Pichler diagnosed Gwinn with a "longitudinal tear within the body of the Achilles tendon." Dr. Pichler placed him in a cast on November 22, 2004.

In December 2004, Gwinn filed an application for alternative medical care. A hearing was conducted before the workers' compensation commissioner. The commissioner found Dr. Galles was providing reasonable care and denied the application.

The hearing on the petition for workers' compensation benefits was scheduled for January 25, 2005. Gwinn returned to Dr. Galles for an appointment on January 11, 2005. He arrived at Dr. Galles' office with a video camera and a family member. Dr. Galles examined Gwinn and found he had normal range of motion in his ankle. He also determined Gwinn's Achilles tendon was intact and the muscle was normal. Dr. Galles concluded Gwinn displayed symptoms disproportionate with the perceived injury and the medical tests and examinations. Additionally, Dr. Galles recommended a functional capacity work assessment and physical therapy, but he believed surgery would not improve Gwinn's condition. The following day, Gwinn again consulted Dr. Pichler, who scheduled him for surgery on January 19, 2005.

The arbitration hearing was held as scheduled on January 25, 2005. Gwinn testified that Dr. Pichler performed the scheduled surgery, but Gwinn did not present records or reports of the event other than a "surgical schedule sheet." Gwinn also failed to produce a report of the ultrasound test, which Dr. Pichler relied upon to diagnose a tear in the Achilles tendon.

The deputy commissioner found the injury Gwinn sustained on April 25, 2001, caused a permanent impairment. The deputy primarily based his conclusion on Dr. Pichler's medical finding of a tear in the Achilles tendon revealed by the ultrasound test. The deputy also found Gwinn was entitled to total temporary disability benefits beginning on November 22, 2004, the date Dr. Pichler applied the cast to Gwinn's foot. However, the deputy determined that an award of permanent partial disability was premature because the results of the surgery were unknown. The deputy concluded that such an award would need to be determined in a review-reopening proceeding. The deputy further determined Gwinn was entitled to recover medical expenses for the unauthorized care provided by Dr. Pichler consisting of the casting and surgery. This conclusion was based on a two-pronged finding by the deputy. First, the deputy concluded the employer and the employer's insurance carrier were responsible for the unauthorized care obtained by Gwinn because they denied liability for a permanent impairment of the foot. Second, the deputy found the unauthorized care was beneficial to improving Gwinn's physical condition. Finally, the deputy ordered Dr. Pichler to be the future medical care provider and established the rate of compensation.

The workers' compensation commissioner adopted the decision of the deputy commissioner as a final agency decision on intra-agency appeal. Additionally, the commissioner further explained why Bell Brothers denied liability for the condition treated by Dr. Pichler. The commissioner's appeal decision determined Bell Brothers denied liability by denying causation of the requested medical expenses of Dr. Pichler in the hearing report and by failing to provide care or therapy to Gwinn despite his continuing complaints. Bell Brothers sought judicial review. The district court affirmed the decision of the commissioner.

The employer and the employer's insurance carrier appealed. They raised four issues. First, they claimed the finding of a permanent impairment by the commissioner was not supported by substantial evidence. Second, they argued the award of healing-period benefits was not supported by substantial evidence. Third, they argued the commissioner erred in awarding Gwinn medical expenses because the casting and surgery performed by Dr. Pichler constitute unauthorized medical care, and alternatively, the award was not supported by substantial evidence. Finally, they argued the decision by the commissioner to designate Dr. Pichler as an authorized treating physician was not supported by substantial evidence.

We transferred the case to the court of appeals. It affirmed the decision of the district court. We granted further review.

## II.  Standard of Review.

We apply the standards of judicial review set forth in the Iowa Administrative Procedure Act in our review of workers' compensation decisions. *Tyson Foods, Inc. v. Hedlund*, 740 N.W.2d 192, 195 (Iowa 2007). The claims raised for review in this appeal primarily require us to apply the substantial-evidence standard. We may reverse, modify, or grant other relief when agency action is based on fact determinations "not supported by substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(*f*) (2001). "Substantial evidence" is statutorily defined as

> the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

*Id.* § 17A.19(10)(*f*)(1). To the extent error is predicated on an erroneous interpretation of the law, we do not give deference to the workers'

compensation commissioner. *Schadendorf v. Snap-On Tools Corp.*, 757 N.W.2d 330, 334 (Iowa 2008).

### III. Permanent Impairment.

We begin our resolution of this appeal with the claim by Bell Brothers that the commissioner's finding that Gwinn suffered a permanent impairment was unsupported by substantial evidence. In light of the weight of the medical opinions that contradict the opinion by Dr. Pichler, Bell Brothers asserts there was no substantial evidence to support the conclusion by the commissioner that Gwinn suffered a permanent impairment. More specifically, Bell Brothers argues the commissioner improperly relied on the ultrasound test to accept the medical opinion of Dr. Pichler over the conflicting opinions of the other doctors when there was no evidence in the record that the surgery performed by Dr. Pichler following the ultrasound test confirmed the existence of a tear in the Achilles tendon and when its own doctors had no opportunity to review and scrutinize the results of the ultrasound test prior to the arbitration hearing.

The arguments by Bell Brothers not only challenge the sufficiency of the evidence, but also imply that the hearing on the claim for permanent partial disability benefits and the finding of a permanent impairment were premature. We begin our resolution of this issue with the latter two points because we believe they lead us to the conclusion that, in this case, it was improper for the commissioner to make a finding of a permanent impairment without first finding Gwinn had achieved maximum medical improvement. This conclusion can best be explained by first considering the differences between temporary and permanent disability awards.

Although early workers' compensation law made no distinction between temporary and permanent disability, our workers' compensation law now provides for separate awards based on the temporary and permanent

nature of a disability. *See* 4 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 80.03[1], at 80–4 (2009) [hereinafter Larson] (recognizing the earliest compensation laws simply paid benefits during a period of wage loss); *see also* Iowa Code § 85.33 (providing for temporary total disability and temporary partial disability); *id.* § 85.34 (providing for permanent disability). The difference between awards for temporary and permanent disability can be best illustrated by considering a typical industrial injury.

Normally, an industrial injury gives rise to a period of healing accompanied by loss of wages. 4 Larson § 80.03[2], at 80–5. During this period of time, temporary benefits are payable to the injured worker. *Id.* Generally, these benefits attempt to replace lost wages (and provide medical and hospitalization care) consistent with the broad purpose of workers' compensation: to award compensation (apart from medical benefits), not for the injury itself, but the disability produced by a physical injury. *See also id.* § 80.02, at 80–2 (recognizing distinctive feature of workers' compensation system to make awards for disability). In Iowa, these benefits are spelled out in Iowa Code sections 85.33, 85.34, and 85.37. These temporary benefits include temporary total disability benefits and healing-period benefits. They refer to the same condition, but have separate purposes depending on whether the injury leads to a permanent condition. *Clark v. Vicorp Rests., Inc.*, 696 N.W.2d 596, 604–05 (Iowa 2005). If the injury results in a permanent partial disability, payments made prior to an award of permanent partial disability benefits are healing-period benefits. If the award does not result in permanent disability, the payments are called total temporary disability benefits. *Id.* at 604. Nevertheless, an award for healing-period benefits or total temporary disability benefits are only temporary benefits and do not depend on a finding of a permanent impairment.

The period of healing is then followed by recovery or stabilization of the condition "and probably resumption of work." 4 Larson § 80.03[2], at 80–6. Any disability that remains after stabilization of the condition gives rise to "either a permanent partial or a permanent total award." *Id.* In other words, maximum physical recovery marks the end of the temporary disability benefits, and at that point, any permanent disability benefits can be considered.

This review of temporary and permanent disability awards reveals that a fundamental component of a permanent impairment is stabilization of the condition or at least a finding that the condition is "not likely to remit in the future despite medical treatment." American Medical Association, *Guides to Evaluation of Permanent Impairment* 27 (6th ed. 2008). In other words, stabilization is the event that allows a physician to make the determination that a particular medical condition is permanent. *Municipality of Anchorage v. Leigh*, 823 P.2d 1241, 1242 n.3 (Alaska 1992) (" 'A physician can determine . . . whether or not a particular medical condition has become permanent because it is static or well-stabilized.' " (quoting American Medical Association, *Guides to Evaluation of Permanent Impairment*, Preface at x (2d ed. 1984))).

The symmetry of the process reveals that a claim for permanent disability benefits is not ripe until maximum medical improvement has been achieved. *See* 4 Larson § 80.03D[3] n.10, at D80–43 to D80–48.2 (recognizing cases generally holding it is premature to award permanent impairment benefits when medical stabilization has not yet been reached). Until that time, only temporary benefits are available. A finding by the commissioner that the injuries sustained by a worker produced a permanent impairment is only relevant in determining an award for permanent disability benefits. Thus, it is only necessary for the commissioner to

determine the existence of a permanent impairment once a claim for permanent disability benefits is ripe.

We acknowledge it is possible, in many cases, for the commissioner to decide the existence of a permanent impairment, as the commissioner did in this case, in advance of maximum medical improvement and before the claim for permanent disability benefits is ripe for adjudication. Yet, this approach should be limited to those instances when the period of recovery and stabilization will only produce evidence relevant to the degree of permanent disability. When the period of recovery and stabilization will provide relevant evidence to make a full and fair assessment of conflicting medical opinions over the existence of a permanent impairment, the decision must not be made until maximum medical improvement has occurred. If the commissioner decides the issue of permanency before an award is ripe, the commissioner risks making a final decision that could be undermined by later relevant evidence. Thus, a procedure that allows for the adjudication of issues before the relevant evidence is known could undermine the entire system of workers' compensation by creating the risk of either denying permanent disability benefits to a deserving claimant or requiring an employer to pay permanent disability benefits to a worker who did not suffer a permanent impairment.

In this case, prior to the time Dr. Pichler conducted his ultrasound test and performed surgery, the various physicians had rendered their medical opinions on permanency based on their examination of Gwinn, a review of the records, and a review of the results of medical tests. At that time, the issue of permanency appeared ripe for adjudication. The physicians had rendered their opinions based on maximum medical improvement. Just prior to the hearing, however, Dr. Pichler conducted the ultrasound test and performed surgery based on his findings derived in part

from the test. The commissioner then relied on the ultrasound test results as the justification to accept the medical opinion of Dr. Pichler over the other medical opinions without evidence from the surgery confirming the existence of a tear and without giving the other doctors an opportunity to review the ultrasound test results. The premature resolution of the issue of whether Gwinn suffered permanent impairment undermined Bell Brothers' evidence of no permanent impairment by leaving it with no meaningful opportunity to challenge the diagnostic reliability of the ultrasound test or assess whether the surgery performed less than a week before the arbitration hearing confirmed the presence of a tendon tear. More importantly, the commissioner knew evidence would be forthcoming relevant to the nature and extent of Gwinn's permanent impairment and a resolution of the conflicting medical opinions. The commissioner also knew no award for permanent disability benefits could be made until maximum medical improvement had been achieved.

Under the circumstances of this case, we refrain from applying the substantial evidence test on appeal to reach a final determination of the issue of a permanent impairment when the issue should not have been addressed by the commissioner at the arbitration hearing due to an incomplete record. Instead, the issue of a permanent impairment should be addressed when the issue of an award of permanent disability benefits is ripe for adjudication. This approach is consistent with the needed symmetry in the process, and it protects the interests of the parties, as well as the integrity of the system of awarding benefits to injured workers.

### IV. Unauthorized Medical Care.

The commissioner awarded healing-period benefits or total temporary benefits for the period of Gwinn's recovery from the unauthorized casting and surgery, together with the expenses of the unauthorized casting and

surgery. Bell Brothers claims Gwinn was not entitled to such benefits under the statute because the care provided to him was unauthorized, and the awards either resulted from an erroneous interpretation of the statutes governing the benefits or were not supported by substantial evidence. Thus, we must consider whether an employer can be liable for medical benefits under section 85.27 based on unauthorized medical care to treat a work injury.

A common provision found in most workers' compensation laws requires the employer to furnish medical care to injured employees "in the first instance." 5 Larson § 94.02[1], at 94–11. This provision is consistent with one of the basic tenets of our workers' compensation system to provide prompt compensation to employees who receive a work injury. *See Stufflebean v. City of Fort Dodge*, 233 Iowa 438, 441–42, 9 N.W.2d 281, 283 (1943). In Iowa, the medical-care provision is found in Iowa Code section 85.27, and it requires the employer to furnish a wide range of reasonable medical services for compensable injuries to employees.

The duty of an employer to furnish medical care following notice of injury, prior to an order by the commissioner, is predicated on the employer's acknowledgement that the employee sustained an injury compensable under the workers' compensation statute. Iowa Code § 85.27. Once compensability is acknowledged, the statute contemplates the employer will furnish reasonable medical care and supplies following an injury and will subsequently pay the workers' compensation benefits described in the statute. *Id. See generally id.* §§ 85.33, 85.34.

The obligation of the employer to furnish reasonable medical care produced an understandable controversy between employers and employees over who should select the physician to provide the care. *See* 5 Larson § 94.02[2], at 94–13. This "choice of doctor" debate aligned the value of

allowing the injured worker, derived from the nature and closeness of the doctor-patient relationship, to self-select a care provider against the value "of achieving the maximum standards of rehabilitation by permitting the compensation system to exercise continuous control of the nature and quality of medical services from the moment of injury." *Id.*

Our legislature ultimately resolved the debate by giving the right to choose medical care to the employer, subject to certain employee protections monitored by the workers' compensation commissioner.[1]  *See* Iowa Code

[1]Iowa adopted the right-to-choose provisions of Iowa Code section 85.27 in 1976. *See* 1976 Iowa Acts ch. 1084, § 3.  Since that time, these provisions have been amended and enlarged from time to time to further define the nature of the right and are now contained in section 85.27(4). At the time of the injury sustained by Gwinn in this case, the right-to-choose provisions were contained in an unnumbered paragraph of section 85.27. The legislature placed the provisions in section 85.27(4) in the 2003 Code and added two additional provisions.  These provisions clarified that an employee who chooses care must hold the employer harmless for the cost of the care and further clarified that the employer is not liable for emergency care obtained by the employee if the employee's condition was not related to work.  There have been no amendments to the right-to-choose provisions that affect the issues in this appeal since the date of Gwinn's injury.  Thus, we will proceed using the most recent version's structure.  Section 85.27(4) (2009) reads as follows:

> For purposes of this section, the employer is obliged to furnish reasonable services and supplies to treat an injured employee, and has the right to choose the care. If the employer chooses the care, the employer shall hold the employee harmless for the cost of care until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization. An employer is not liable for the cost of care that the employer arranges in response to a sudden emergency if the employee's condition, for which care was arranged, is not related to the employment. The treatment must be offered promptly and be reasonably suited to treat the injury without undue inconvenience to the employee. If the employee has reason to be dissatisfied with the care offered, the employee should communicate the basis of such dissatisfaction to the employer, in writing if requested, following which the employer and the employee may agree to alternative care reasonably suited to treat the injury. If the employer and employee cannot agree on such alternative care, the commissioner may, upon application and reasonable proofs of the necessity therefor, allow and order other care. In an emergency, the employee may choose the employee's care at the employer's expense, provided the employer or the employer's agent cannot be reached immediately. An application made under this subsection shall be considered an original proceeding for purposes of commencement and contested case proceedings under section 85.26. The hearing shall be conducted pursuant to chapter 17A. Before a hearing is scheduled, the parties may choose a telephone hearing or an in-person

§ 85.27(4) (2009). The author of the leading treatise on workers' compensation law has characterized the rationale for giving the employer, rather than the employee, the right to choose the provider of medical care:

> If the injured employee has completely unlimited free choice of doctor, in some cases he or she may select a doctor, because of personal relationship or acquaintance, who is not qualified to deal with the particular kind of case, or who at any rate is incapable of providing service of the quality required for the optimum rehabilitation process.[2]

5 Larson § 94.02[2], at 94–13.

The protections for employees provided under this statute basically modify the employer's right to choose medical care in three ways. First, an employee is permitted to choose his or her own medical care at the employer's expense "[i]n an emergency" when the employer "cannot be reached immediately." Iowa Code § 85.27(4). Second, the employee and employer may consent to alternative medical care paid by the employer. *Id.* Finally, the workers' compensation commissioner may order alternative care paid by the employer following a prompt, informal hearing when the employee is dissatisfied with the care furnished by the employer and establishes the care furnished by the employer was unreasonable. *Id.*

Beyond these circumstances, the employer has the right to select the medical care. Nevertheless, the employer's right to choose medical care does not prevent the employee from choosing his or her own medical care at his or

---

hearing. A request for an in-person hearing shall be approved unless the in-person hearing would be impractical because of the distance between the parties to the hearing. The workers' compensation commissioner shall issue a decision within ten working days of receipt of an application for alternative care made pursuant to a telephone hearing or within fourteen working days of receipt of an application for alternative care made pursuant to an in-person hearing. The employer shall notify an injured employee of the employee's ability to contest the employer's choice of care pursuant to this subsection.

[2]We observe that the costs of medical care to the employer, as well as other considerations, have emerged to further fuel the debate over the right to choose and to produce tension between employers and employees over the choice of medical care.

her own expense under two circumstances. Both of these circumstances normally arise when a dispute occurs between the parties.

The first circumstance in which an employee can select his or her own medical care is when the employer denies compensability of the injury. The right to control medical care emanates entirely from the duty to furnish medical care for injuries compensable under the workers' compensation laws. *See id.* (describing employer's duty to furnish reasonable medical care for compensable injuries). Without the duty to furnish care, the employer has no right to control care. Thus, if the employer contests the compensability of the injury following notice, the statutory responsibility of the employer to furnish reasonable medical care to the employee or pay other employee benefits described in the workers' compensation statute is not imposed until the issue of compensability is resolved in favor of the employee. Likewise, the employer has no right to choose the medical care when compensability is contested. Instead, the employee is left to pursue his or her own medical care for the injury at his or her own expense and is free to pursue a claim against the employer to recover the reasonable cost of medical care upon proof of compensability of the injury. If the employee establishes the compensability of the injury at a contested case hearing, then the statutory duty of the employer to furnish medical care for compensable injuries emerges to support an award of reasonable medical care the employer should have furnished from the inception of the injury had compensability been acknowledged.

Thus, the statute contemplates that an injured employee may select his or her own medical care when the employer abandons the injured employee through the denial of compensability of the injury. When this circumstance occurs, the employee may subsequently recover the costs of the reasonable medical care obtained upon proof of compensability of the

injury derived from the statutory duty of the employer to furnish reasonable medical care and supplies for all compensable injuries.

The second circumstance under which an injured employee may select his or her medical care is when the employee abandons the protections of section 85.27 or otherwise obtains his or her own medical care independent of the statutory scheme. This circumstance would ordinarily occur when the employer admits compensability of the injury and assumes responsibility for furnishing medical care, but the employee disagrees with the care provided or otherwise rejects the care, and obtains alternative medical care with neither the consent of the employer nor an order for alternative care from the workers' compensation commissioner. Unlike the first situation, this circumstance would normally occur when a difference of opinion over a diagnosis or treatment arises, "as when the employer's doctor recommends conservative measures while the claimant thinks he or she should have surgery." 5 Larson § 94.02[5], at 94–19.

The commissioner concluded Gwinn fell within the first circumstance, reasoning a denial of permanent disability by an employer is tantamount to a denial of compensability. Nevertheless, the commissioner alternatively held Gwinn could recover even if he fell within the second circumstance because the alternative care obtained by Gwinn was beneficial. Thus, the commissioner concluded Bell Brothers is responsible for the cost of Dr. Pichler's care despite the fact that it was unauthorized.

We have previously said an employer is not responsible for the cost of alternative medical care that is not authorized by section 85.27. *R.R. Donnelly & Sons v. Barnett*, 670 N.W.2d 190, 196 (Iowa 2003). In doing so, we indicated an employer has a lack-of-authorization defense against claims for unauthorized care brought by the employee. *Id.* However, these general pronouncements in *Donnelly* were not intended to relate to contested-

hearing claims for unauthorized care brought by an employee against an employer as part of a claim for benefits. Instead, these general pronouncements addressed the responsibility of the employer for claims of unauthorized medical care against the employer prior to an adjudication of compensability of the claim. The lack of statutory authorization for medical care only relieves the employer of its statutory obligation to pay for medical care at the time it is obtained by the employee. Unlike authorized medical care, an employer is not required to hold an employee harmless for the expense incurred by an employee for unauthorized medical care prior to an adjudication of compensability.

In *Donnelly*, we did address the viability of the lack-of-authorization defense at the final hearing, but only in the limited context of a claim by an employee for medical care obtained by the employee after the commissioner had dismissed the employee's application for alternative care based on the employer's denial of compensability. *Id.* at 197–98. We held the employer had no lack-of-authorization defense under that circumstance. *Id.* at 198. Instead, the employee can recover on a claim for reasonable medical care upon proof of compensability of the injury. We suggested lack of authorization could have merit in a case when the alternative medical care was obtained after the commissioner dismissed an employee's application for alternative care on the merits, but we did not have the opportunity to further explain the extent of or manner in which the lack of authorization influences a claim for unauthorized medical care asserted by an employee at a contested-case hearing. *Id.* This case, however, provides such an opportunity. Thus, we proceed to determine the impact of the lack of authorization on a claim for reimbursement of unauthorized medical expenses at a contested-case hearing.

We begin by recognizing that nothing in the statute prohibits an injured employee from selecting his or her own medical care at his or her own expense at any time following an injury. *Id.* at 197. Additionally, the statute contains no language to indicate the basic duty of an employer to furnish reasonable medical care for compensable injuries is discharged once an employee deprives an employer of its right to control medical care by obtaining alternative care not authorized by the statute. Clearly, the legislature has not specifically addressed the issue of reimbursement for unauthorized medical care. Instead, the claim that an employer is not responsible for expenses based on unauthorized care resonates solely from the employer's loss of the statutory right to choose care when an employee abandons the care provided by the employer and obtains unauthorized alternative care without the employer's consent or the commissioner's authorization.

While it may, in some circumstances, be unreasonable for an employee to seek unauthorized medical care, we recognize that legitimate differences of opinion over the diagnosis and treatment of an injury can arise between an employer and employee, as well as between medical doctors. *See* 5 Larson § 94.02[5], at 94–19. Moreover, these differences of opinion may support two or more reasonable courses of action that only the benefit of hindsight can best resolve. *See id.* at 94–19 to 94–20 (citing cases that impose liability on employers for unauthorized medical care that proved more successful than treatment by employer's physician). Yet, the reasonableness of unauthorized treatment can normally only be fully evaluated in light of the effectiveness of the treatment. *Linn Care Ctr. v. Cannon,* 704 P.2d 539, 540 (Or. App. 1985). Additionally, the statute only requires the employer to furnish reasonable medical care. *See* Iowa Code § 85.27(4) (referring to "reasonable" medical care and services); *Long v. Roberts Dairy Co.,* 528 N.W.2d 122, 123 (Iowa

1995) (recognizing employee must show employer's choice of treatment was unreasonable to establish claim for alternative care). Thus, without the opportunity to make a later claim for unauthorized alternative care at a contested-case hearing, an employee with a reasonable dispute over the choice of care would either be forced to accept the employer-provided care and be deprived of an opportunity for a better medical outcome with alternative care, or be forced to override the employer-provided care at his or her own financial burden. Furthermore, if denied an opportunity to make a claim for unauthorized care at a contested-case hearing, an injured employee could face this predicament even if the unauthorized alternative care proved to be more beneficial than the care offered by the authorized provider(s) would likely have produced and even if the employee's decision to pursue alternative care did not implicate the purpose and concerns of the statute giving the employer the right to choose care. *See Zomer v. W. River Farms, Inc.*, 666 N.W.2d 130, 133 (Iowa 2003) (stating the workers' compensation statutes are to be interpreted consistently with their purpose).

We do not believe the statute can be narrowly construed to foreclose all claims by an employee for unauthorized alternative medical care solely because the care was unauthorized. Instead, the duty of the employer to furnish reasonable medical care supports all claims for care by an employee that are reasonable under the totality of the circumstances, even when the employee obtains unauthorized care, upon proof by a preponderance of the evidence that such care was reasonable and beneficial. In this context, unauthorized medical care is beneficial if it provides a more favorable medical outcome than would likely have been achieved by the care authorized by the employer. The allocation of this significant burden to the claimant maintains the employer's statutory right to choose the care under section 85.27(4), while permitting a claimant to obtain reimbursement for

alternative medical care upon proof by a preponderance of the evidence that such care was reasonable and beneficial.

This approach allows the employer to maintain control when the care provided is reasonable and beneficial, but recognizes there are times when multiple, apparently reasonable courses of medical treatment coexist. As such, it gives the employee a chance to recover for reasonable and beneficial but unauthorized medical care when the purposes of allocating to the employer the power to select medical care are not jeopardized. This interpretation of the statute is consistent with the overall approach of section 85.27(4) to balance the control given to the employer with safeguards for the employee. This interpretation is also consistent with our approach to interpret workers' compensation statutes liberally in favor of the worker. *Myers v. F.C.A. Servs., Inc.*, 592 N.W.2d 354, 356 (Iowa 1999). Thus, we proceed to examine the sufficiency of the evidence to support the finding by the commissioner that Gwinn is entitled to recover benefits and expenses for alternative medical care.

**A. Claim for Expenses of Medical Care Based on the Denial of Compensability.** The commissioner found Gwinn was justified in obtaining medical care from Dr. Pichler because Bell Brothers denied that his injury caused a permanent condition and denied the injury caused the condition treated by Dr. Pichler. Having found such denials were tantamount to a denial of compensability, the commissioner found the care provided by Dr. Pichler was recoverable as reasonable and necessary. In other words, the commissioner found Gwinn's claim for the reasonable expense of his self-selected medical care fell within the first circumstance that permits an employee to choose his or her own care and to seek a subsequent claim for reimbursement of the reasonable expense of the care.

Although the analysis adopted by the commissioner draws upon our discussion in *Trade Professionals, Inc. v. Shriver*, 661 N.W.2d 119, 124 (Iowa 2003), of a claim for self-selected medical care obtained by an employee after the employer concluded the continuing problems experienced by the employee were not work-related, we reject the notion that an employer loses the right to choose medical care under section 85.27 when the employer acknowledges the compensability of a work-related injury and furnishes care but later disputes the nature and extent of the disability. The employer's right to control medical care attaches under the statute when the employer acknowledges compensability following notice and furnishes care to the employee, and it remains with the employer under the statute until the employer denies the injury is work-related, withdraws authorization of the care, or until the commissioner orders alternative care. Iowa Code § 85.27. Thus, a denial of compensability that results in the employer's loss of the right to choose the medical care is a denial that the claimed injury arose in the course and scope of employment. A dispute between the parties as to the nature or extent of a physical or mental disability arising from an injury for which the employer has acknowledged liability during the time medical care is controlled by the employer, is not a ground, standing alone, for a determination that the employer has forfeited its right to select the medical care. If a dispute as to the nature and extent of the injury were tantamount to a denial of compensability (liability), then the right of the employer to choose medical care under the statute would be virtually meaningless. Such an interpretation would mean an employer only controls care until an employee disagrees with the authorized provider's assessment of the nature and extent of the injury or the reasonableness of the provider's medical care. It would mean an employer would be required to accept the employee's view of these matters in order to maintain the right to control the care. We

refrain from interpreting statutes in a way that would lead to absurd results. *Schadendorf*, 757 N.W.2d at 338.

Clearly, the dispute in this case involved a difference of opinion over the diagnosis and treatment of Gwinn's medical condition. The dispute did not involve Bell Brothers' liability for the injury.

Under the proper analysis, there was no substantial evidence to support the conclusion by the commissioner that Bell Brothers denied compensability of the injury. Consequently, we turn to consider whether substantial evidence supports the alternative finding by the commissioner that the expenses of the unauthorized medical care by Dr. Pichler were recoverable as beneficial and necessary.

**B. Claim for Unauthorized Medical Care.** Although an employee may assert a claim for expenses of the unauthorized medical care, the employee must prove the unauthorized care was reasonable and beneficial under all the surrounding circumstances, including the reasonableness of the employer-provided care, and the reasonableness of the decision to abandon the care furnished by the employer in the absence of an order from the commissioner authorizing alternative care. Consistent with the rationale for giving the employer control over medical care, the concept of reasonableness in this analysis includes the quality of the alternative care and the quality of the employer-provided care. As we have already noted, the question of whether the unauthorized care was beneficial focuses on whether the care provided a more favorable medical outcome than would likely have been achieved by the care authorized by the employer. The commissioner found Gwinn could recover because the care rendered by Dr. Pichler was necessary and beneficial. The commissioner made this finding based on evidence that the surgery was expected to improve Gwinn's physical condition, an outcome that would benefit Bell Brothers by reducing the

amount of permanent partial disability benefits it would ultimately be required to pay.

We conclude there was no substantial evidence in the record to support a finding that the alternative medical care claim was reasonable and beneficial under all the circumstances. Three reasons primarily support this conclusion.

First, there was no substantial evidence that the results of the surgery were beneficial. Gwinn was in a wheelchair at the time of the hearing and was still recovering from surgery. There was a complete absence of any evidence in the record that the surgery performed by Dr. Pichler improved Gwinn's condition. The commissioner's finding that the surgery was beneficial was clearly premature and based on speculation.

Second, there was no evidence offered by Gwinn that Dr. Pichler's diagnosis of a torn Achilles tendon was in fact reasonable or accurate. In particular, there was no evidence in this record that the surgical procedure performed by Dr. Pichler confirmed a tear in the Achilles tendon for which the casting and surgery were prescribed and undertaken. The lack of this type of evidence directly impacts the rationale for giving the employer the right to choose.

Third, under the factual scenario presented here, Bell Brothers was denied an opportunity to review the ultrasound study and the reports from the surgery performed by Dr. Pichler, crucial evidence bearing upon whether the alternative care was reasonable in this case. Bell Brothers' ability to assess and litigate the reasonableness of the alternative care for which Gwinn sought reimbursement and its right to control the medical care were consequently undermined.

The issue of whether the unauthorized care was reasonable and beneficial presents fact questions. *See Manpower Temp. Servs. v. Sioson,*

529 N.W.2d 259, 263 (Iowa 1995) ("Because it is disputed, the reasonableness part of the question is factual."). Reviewing the record as a whole, there is an absence of substantial evidence to support findings as to the reasonableness and beneficial effects of the alternative medical care provided by Dr. Pichler. *See* Iowa Code § 17A.19(10)(*f*). As a result, the commissioner's conclusion undermined the statutory right of the employer to choose care and conflicted with the purpose of giving the right to the employer.

**C. Claim for Healing-Period Benefits Based on Unauthorized Care.**
The commissioner awarded healing-period benefits for the period that Gwinn missed work in connection with the unauthorized medical procedures administered by Dr. Pichler. In a related context, we have held a claimant who misses work to attend unauthorized medical care appointments is not entitled to healing-period benefits. *Thilges v. Snap-On Tools Corp.*, 528 N.W.2d 614, 617 (Iowa 1995). We observed that the applicable statutes provide no indication that the legislature intended workers to receive awards for unauthorized medical appointments in the normal course of events. *Id.*

The healing-period benefits awarded by the commissioner in this case were based solely on Gwinn's recovery time from the unauthorized casting and surgery performed by Dr. Pichler. Without substantial evidence to support a finding that the unauthorized medical care was reasonable and beneficial under the totality of the circumstances, there was no evidence to support a finding that the temporary disability on account of the unauthorized casting and surgery was causally related to the injury.

**V. Alternative Medical Care.**

To establish a claim for alternative medical care, an employee must show that the medical care furnished by the employer is unreasonable. *Long*, 528 N.W.2d at 123. Here, the commissioner found the employer-

provided care was unreasonable. Because we find no substantial evidence supports a finding of reasonableness of the unauthorized alternative care, we also find no substantial evidence to designate an alternative-care provider.

## VI. Conclusion.

We conclude the contested findings of the commissioner were not supported by substantial evidence in the record. Under section 17A.19(10)(*f*), we may reverse, modify, or grant other appropriate relief when important findings of a workers' compensation decision were not supported by substantial evidence. This case should be remanded for additional evidence to allow for a full and complete resolution of the issues presented under the legal standards clarified in this decision. The arbitration hearing that served as a basis for this appeal was premature. Not only was Gwinn's claim for permanent partial disability benefits premature, but so were his claims for temporary benefits and the cost of Dr. Pichler's unauthorized medical care. These claims can only be properly evaluated when Gwinn has reached maximum medical improvement, and the results of the unauthorized surgery are known. We reverse the decision of the district court and remand the case to the district court for an order of remand for further proceedings before the workers' compensation commissioner.

**DECISION OF THE DISTRICT COURT REVERSED AND CASE REMANDED.**

All justices concur except Baker, J., who takes no part.