# IN THE COURT OF APPEALS OF IOWA

No. 14-0202
Filed November 26, 2014

CATHOLIC HEALTH INITIATIVES
d/b/a MERCY MEDICAL CENTER,
    Petitioner-Appellant,

vs.

WENDY HUNTER,
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Richard G. Blane II,

Judge.

An employer appeals from the judicial review ruling affirming the workers'

compensation commissioner's award of benefits to an employee. **AFFIRMED.**

David Scieszinski of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des

Moines, for appellant.

Jason W. Miller and Michael J. Miller of Patterson Law Firm, L.L.P., Des

Moines, for appellee.

Heard by Potterfield, P.J., Sackett, S.J.,* and Eisenhauer, S.J.*

*Senior judges assigned by order pursuant to Iowa Code section 602.9206
(2013).

**EISENHAUER, S.J.**

An employer appeals from the district court's ruling on judicial review, which affirmed the workers' compensation commissioner's award of temporary disability benefits and medical care to its employee. The employer challenges the benefits award in four respects. First, it claims the employee is not entitled to temporary disability benefits or healing period benefits because she is capable of performing substantially similar employment. Second, it contends the employee failed to prove a causal connection between her work injury and disability. Third, it contends the employee did not sustain a work-related neck injury. Finally, the employer contends the employee is not entitled to payment of medical expenses for her unauthorized medical care. We affirm in all respects.

*I. Background Facts and Proceedings.* Wendy Hunter has systemic lupus erythematosus, a condition she controls with prescription medication. Her symptoms are joint pain, aches and pains throughout her body, stiffness, diffuse discomfort, fatigue, and difficulty sleeping. She began receiving Social Security disability benefits in 2001.

When Hunter's Social Security benefits were terminated in 2003 or 2004, she returned to school to become certified as a pharmacy technician. She completed the pharmacy technician program at Mercy College and became certified in May 2006. After graduating, she was hired as a Pharmacy Technician II at Mercy Medical Center (Mercy). The job description for a Pharmacy Technician II lists the following physical requirements: "Exerting up to 50 pounds of force occasionally and/or up to 20 pounds of force frequently, and/or up to 10 pounds of force constantly to move objects."

On May 25, 2009, Hunter slipped and fell while exiting the back door of the pharmacy, landing on her left side. She reported the incident to Mercy the following day, stating she landed on her "left wrist, hip, and knee." She also listed "constant headaches" and "wrist, hip + joint pain" as the nature of her injury.

On May 27, 2009, Hunter was treated for her injuries by Dr. Vandivier, whose notes of the visit state Hunter "[s]ays that today the hip is greatly improved but she still has quite a bit of tenderness within her elbow and her upper arm." Dr. Vandivier returned Hunter to work without restrictions. In a follow-up appointment on June 17, 2009, Hunter reported that she felt good in the morning, but that her pain would progressively worsen throughout the day. By the end of the shift, Hunter stated she was "quite sore" and required pain medication to sleep or she would awaken when she rolled onto her left hip. Dr. Vandivier referred her for physical therapy.

Sometime after her slip and fall at work, Hunter fell while vacuuming the stairs in her home.[1] She "landed on [her] bottom," but claims she had no pain or

---

[1] There is a discrepancy as to when the fall took place. On August 14, 2009, Hunter was seen at Highland Park Family Physicians. The reason for her visit is listed in the medical notes as follows: "Wendy is here due to falling down stairs with a vacuum cleaner approx. 2 months ago. She continues to have joint pain and back pain since that time." Hunter's arbitration hearing testimony on the matter does not clarify the matter. She testified as follows:

> Q. Your fall on the stairs with the vacuum, that was in August of 2009? A. I'm not sure.
> Q. Assuming that was in August of 2009, would you have seen Dr. Mahoney before you fell on these stairs? A. After my fall I would have seen Dr. Mahoney, yes.
> Q. How about after your fall on the stairs? A. No.
> Q. You would've seen your—Dr. Mahoney before your fall on the stairs—well before you fell down the steps at home with the vacuum? A. Yes.

other symptoms following, though she reported the fall to healthcare providers as a possible cause for her lower back pain. At her deposition, Hunter initially denied her fall on the stairs, but later admitted she had fallen when her hip gave out. She claims her hip began giving out after her May 25, 2009 fall at work.

On August 14, 2009, Hunter sought medical treatment for joint and back pain and was referred to Dr. Mahoney, who she saw on August 28, 2009. Dr. Mahoney's notes list Hunter's symptoms as bilateral hip pain that was greater on the left side and lower back pain. She reported that standing for long period of times increased her pain. Dr. Mahoney's notes from that visit state Hunter "has a history of some pain in the hips and also Lupus," but do not cite a more specific history or any traumatic events. He assessed Hunter as having greater trochanteric bursitis and recommended physical therapy and Celebrex.

Hunter received therapy through Accelerated Rehabilitation Centers with Dr. Mahoney's referral. The records from her October 6, 2009 visit list both her May 25, 2009 work injury and the fall while vacuuming the stairs. The onset of low-back pain was reported as occurring in May of 2009. Hunter was initially inconsistent in attending her physical therapy sessions, claiming the exercises increased her pain. She reported this complaint to Dr. Mahoney on January 7, 2010, and he recommended she undergo phonophoresis, manual massage, and strengthening exercises during physical therapy. After doing so for the remainder of the month, Hunter experienced dramatic improvement.

---

Because Hunter was not referred to Dr. Mahoney until her August 14, 2009 visit to Highland Park Family Physicians, where she reported the fall on her stairs, her testimony at the hearing was incorrect.

The symptoms caused by Hunter's May 25, 2009 work injury had largely resolved when on March 3, 2010, Hunter again slipped and fell at work. She slipped on ice and fell on a sidewalk outside the building, again landing on her left side. Hunter reported the incident to her employer and filled out an employee incident report the same day, which states she experienced "hip, left elbow + middle back pain." On the figure provided on the form, she marked the site of her injury as her left elbow, left hip, and from the side of her neck down to her mid back.

As a result of her fall, Hunter sought treatment at Mercy's emergency department, describing pain in her left arm, left hip, and the middle of her back. Upon arrival, Hunter's fingers were purple and the pinky fingers of each hand were blanched white. She was prescribed Vicodin for pain.

Hunter did not work on March 4, 2010. She returned to work on March 8, 2010. A return-to-work-activity status report states that until March 9, 2010, Hunter was restricted from lifting, pushing, and pulling more than ten pounds, and was to sit half an hour after standing two hours. Hunter reported her job duties that night caused her pain, she needed to sit more frequently, and her hip gave out when lifting thirty-five or more pounds. Her restrictions were altered on March 10, 2010, to allow her to sit for fifteen minutes every two hours. On March 22, 2010, Hunter's restrictions were again altered to add a restriction on repetitive pushing, pulling, twisting, stooping, bending, climbing, kneeling, squatting, or lifting. She was also restricted from working more than eight hours per day.

On March 23, 2010, Hunter met with her employer and was informed that while a full-time, light-duty work schedule (five shifts of eight hours in length) was available, it was only available during the day. Hunter's family obligations required her to work the night shift—ten-hour shifts, four nights per week. Because Hunter's work restrictions prevented her from working the night shift and she refused the offer of a light-duty shift during the day, her employer placed her on Family Medical Leave Act leave.

Unsatisfied with the care provided by her employee-referred doctor and the restrictions placed upon her, Hunter saw Dr. Mahoney on March 25, 2010. He assessed she was having a "[l]ikely flare of greater trochanteric bursitis with a slip at work," prescribed three physical therapy sessions per week, and released her to full-duty work without restrictions on March 29, 2010.

Hunter returned to work full-time, although her physical condition made it difficult to perform some of her job duties, such as standing or lifting heavy boxes. She received a cortisone injection in her left hip from Dr. Mahoney on August 19, 2010, which provided her with approximately eight months of relief from her symptoms. However, her symptoms gradually returned in the same pattern as before.

Hunter took FMLA leave in September and October due to her father's cataract surgery. She returned to work on October 18, 2010. On December 3, 2010, Hunter was terminated for exceeding the amount of annual FMLA leave. At the time, she was earning $18.05 per hour. She received unemployment benefits following her termination and has been unable to find employment.

In May of 2011, Dr. Mahoney expressed his opinion that Hunter suffered from bursitis, which was traceable to her falls at work on May 25, 2009, and March 3, 2010. He also opined these work-related injuries materially aggravated her pre-existing condition of lupus. Dr. Mahoney was of the opinion Hunter had not yet reached maximum medical improvement. As a result, he was not in a position to place any permanent restrictions on her activity at that time.

Dr. Epp performed an independent medical examination of Hunter. In her October 18, 2011 report, Dr. Epp diagnosed Hunter with left hip trochanteric bursitis and cervical pain with radicular symptoms as a result of her May 25, 2009 and March 3, 2010 falls. With regard to her left hip, Dr. Epp opined Hunter achieved maximum medical improvement on August 18, 2011. She believed Hunter had not yet reached maximum medical improvement for her neck injury and recommended a course of treatment be followed to achieve maximum medical improvement; however, if those recommendations were not followed, Dr. Epp opined Hunter could be found to have reached maximum medical improvement on March 3, 2011, one year after the date of injury. Dr. Epp assessed Hunter with a fifteen-percent impairment to the whole person as a result of her neck injury and a three-percent impairment to the whole person as a result of the left hip injury for a total impairment rating of eighteen-percent to the whole person. Dr. Epp recommended restrictions on lifting, pushing, pulling, and carrying ten pounds on a rare basis from floor to waist, twenty pounds on an occasional basis from waist to shoulder, and ten pounds on a rare basis over the shoulder. She recommended Hunter sit "occasionally," and rarely stand, walk, stoop, or bend. Dr. Epp further recommended against crawling, kneeling,

walking on uneven surfaces, or using ladders, and recommended Hunter rarely use stairs.

Dr. Mahoney treated Hunter again on February 23, 2012, for increased pain in her left hip. Dr. Mahoney opined Hunter had still not reached maximum medical improvement for her left hip, which he opined was causally related to her March 3, 2010 fall. He was again unable to determine if Hunter required any physical restrictions as a result of her left hip bursitis.

Hunter filed contested case petitions with the Iowa Workers' Compensation Commissioner for her May 25, 2009 and March 3, 2010 injuries. Following a hearing, an arbitration decision was entered on October 24, 2012, concluding Mercy owed medical expenses and costs incurred for both injuries. The decision awarded Hunter temporary disability benefits on March 4, 2010, and from March 11 through March 28, 2010. It further awarded Hunter healing period benefits from December 3, 2010, continuing as long as Hunter remains temporarily disabled.

Mercy's application for rehearing was denied. On August 13, 2013, the workers' compensation commissioner affirmed the arbitration decision and adopted it as the final agency decision. Mercy then filed a petition for judicial review, and the district court affirmed the agency decision on January 14, 2014. Mercy appeals.

*II. Scope of Review.* Iowa Code chapter 17A (2013) governs our review of the agency's action. *See Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 888 (Iowa 2014). The district court acts in an appellate capacity to correct errors of law in the commissioner's decision. *Id.* We then apply the standards of chapter

17A to determine if our conclusions are the same as those reached by the district court. *Id.* at 889. If they are, we affirm; if not, we reverse. *Id.*

The legislature vests the commissioner with the discretion in making factual determinations. *Id.* We are bound by those determinations if there is "substantial evidence in the record before the court when that record is viewed as a whole." Substantial evidence is "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). Evidence is not insubstantial merely because different conclusions may be drawn from it. *Mike Brooks*, 843 N.W.2d at 889. We do not determine whether the evidence supports different findings, but rather whether it supports the findings actually made. *Id.*

***III. Temporary Disability and Healing Period Benefits.*** Mercy first contends the workers' compensation commissioner erred in awarding Hunter temporary disability benefits or healing period benefits because it claims she is capable of performing substantially similar employment.

An employer is required to pay an employee temporary disability benefits "until the employee has returned to work or is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of the injury, whichever occurs first." Iowa Code § 85.33(1). Similarly, healing period benefits are to be paid for any injury causing permanent partial disability

until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, whichever occurs first.

*Id.* § 85.34(1).

Because Hunter had not returned to work or reached maximum medical improvement at the time of the hearing, the question is whether she is medically capable of returning to substantially-similar employment. Mercy argues Hunter is capable of returning to substantially similar employment because she had returned to her job as a pharmacist technician and was performing her regular job duties up until the time she was terminated for excessive absenteeism. It also notes Dr. Mahoney released Hunter to return to work without restrictions.

Although there were no formal restrictions on Hunter's work from March 29, 2010, to her termination in December 2010, the agency found modifications were made to allow Hunter to complete her work.

> At the time of her termination, claimant remained under active medical care. She credibly testified that although she was completing her full duty work without formal restrictions, she did so with modifications. Modifications included intermittent sitting and assistance from co-workers with heavy lifting. Such modifications are consistent with the work restrictions previously imposed by multiple providers. The restrictions were not accommodated by defendant-employer, leaving claimant with the option of remaining off work without compensation or procuring a full duty work release. These limitations are also consistent with claimant's post-termination job search and subsequent imposition of restrictions by Drs. Mahoney and Epp.

The district court concluded this finding amounted to informal restrictions on Hunter's work after March 29, 2010, and therefore, "Hunter was not able to return to work or perform substantially similar employment."

We reach the same conclusion as the district court. Hunter's symptoms worsened after she performed her job duties, specifically standing and lifting, without the informal accommodations. Those accommodations are similar in nature to the work restrictions in place before March 29, 2010, and those imposed by Dr. Epp in 2011. Because the agency's finding is supported by substantial evidence, we affirm on this issue.

*IV. Hip Condition.* Mercy next contends the commissioner erred in finding Hunter's hip condition is causally connected to her work injuries. It argues Hunter's testimony was not credible, pointing to discrepancies between her deposition testimony and medical records. It argues the evidence supports a finding Hunter's condition was caused by the fall at home, rather than by either workplace injury.

As the trier of fact, the commissioner has a duty to determine witness credibility. *Arndt v. City of Le Claire*, 728 N.W.2d 389, 395 (Iowa 2007). "[W]e give due regard to the commissioner's discretion to accept or reject testimony based on his assessment of witness credibility." *Schutjer v. Algona Manor Care Ctr.*, 780 N.W.2d 549, 558 (Iowa 2010). It is not for this court to determine the relative strength of the evidence before it; rather, it is our job to determine "whether substantial evidence supports a finding '*according to those witnesses whom the [commissioner] believed.*'" *Arndt*, 728 N.W.2d at 394.

Although the agency recognized there was "some variation" between Hunter's testimony and medical records, it determined it was "not outside the range of what is to be expected for a claim involving two stipulated work-related falls for which claimant received care with the same physicians and the existence

of a preexisting lupus condition which admittedly caused symptoms prior to the work-related injuries." We agree. Hunter's deposition testimony is more indicative of someone confusing a timeline of events or forgetting specific details in a lengthy medical history rather than a purposeful attempt to mislead or conceal.

Most important are the agency's findings relating to personal observations at the arbitration hearing, wherein the deputy commissioner noted: "Claimant's demeanor, body position, and posture were good, with excellent eye contact. The undersigned observed the claimant display pain behaviors. Near the end of cross-examination, claimant sat with her right hand placed upon the right side of her neck. Claimant's presentation was indicative of a truthful witness." We defer to these findings for good reason, as Justice Harris noted:

> These determinations are more apt to be just when the objective facts are squared with the judge's subjective impressions, gained from close personal observations. One who personally observes holds a clear advantage over us who learn the case from a cold record. The first-hand observer can translate that advantage into a more just disposition. It is not in the public interest for appellate courts to strain to seek out fine-tune adjustments in these matters.

*See In re Marriage of Wegner*, 434 N.W.2d 397, 400 (Iowa 1988) (Harris, J., dissenting).

Accepting the finding regarding Hunter's credibility, we are then left to determine whether substantial evidence supports the agency's finding on causation. "Medical causation is a question of fact vested in the commissioner's discretion." *Mike Brooks*, 843 N.W.2d at 889. It is "within the domain of expert testimony." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011). The weight given to an expert's testimony depends on the accuracy of

the facts the expert relied upon and other surrounding circumstances; if it is based on an incomplete history, the opinion is not binding upon the commissioner. *Id.* Ultimately, the decision to accept or reject an expert's opinion is within the "peculiar province" of the commissioner. *Id.*

We conclude substantial evidence supports the agency's finding Hunter's hip condition was caused by her 2009 and 2010 workplace injuries. Both Drs. Mahoney and Epp gave opinions within a reasonable degree of medical certainty to support this finding. No expert witness evidence was offered to rebut their opinions. Hunter disclosed the fall in her home to her medical providers as a possible cause of her condition, but maintains she never had any pain as a result of that fall. She testified the fall occurred when her "hip gave out" while carrying her vacuum downstairs. She further testified at the hearing her hip started giving out only after her fall on May 25, 2009.

Because we agree with the district court's determination substantial evidence supports the agency's finding on causation, we affirm on this issue.

*V. Neck Injury.* Mercy also contends there is insufficient evidence to support the conclusion she sustained a work-related injury to her neck on March 3, 2010. It argues Hunter never indicated she had neck pain following her fall.

Substantial evidence supports the finding Hunter suffered a work-related injury to her neck on March 3, 2010. On that day, Hunter filled out an employee incident form in which she indicated an injury from the right side of her neck radiating downward into the middle of her back. Dr. Epp determined the fall caused an injury to Hunter's neck and assessed her with a fifteen-percent

impairment to the whole body as a result. While Dr. Epp is the only expert to attribute a neck injury to Hunter's fall at work, the opinion is unrebutted in the record. Having reached the same conclusion as the district court, we affirm on this issue.

***VI. Unauthorized Medical Care.*** Finally, Mercy contends the commissioner erred in awarding medical expenses Hunter incurred in seeking treatment from Dr. Mahoney. It argues the commissioner erred in determining Hunter was entitled to such an award "<u>solely</u> because the care improved Hunter's condition."

When an employer acknowledges an employee sustained an injury compensable under the workers' compensation statute, the employer is to furnish reasonable medical care and supplies. *Bell Bros. Heating & Air Conditioning v. Gwinn*, 779 N.W.2d 193, 202 (Iowa 2010). However, the legislature has bestowed the right to choose medical care to the employer, subject to certain employee protections. *Id.* at 203. If an employee obtains unauthorized medical care, an employer may be required to reimburse the cost of that care if the employee proves "the unauthorized care was reasonable and beneficial under all the surrounding circumstances, including the reasonableness of the employer-provided care, and the reasonableness of the decision to abandon the care furnished by the employer in the absence of an order from the commissioner authorizing alternative care." *Id.* at 208. When considering what is reasonable under this analysis, we must consider the quality of the alternative care and the quality of the employer-provided care. *Id.* "[T]he question of whether the unauthorized care was beneficial focuses on whether the care provided a more

favorable medical outcome than would likely have been achieved by the care authorized by the employer." *Id.*

In determining Hunter was entitled to compensation for unauthorized medical care, the agency notes the parties stipulated Hunter sustained a work-related injury. It goes on to find the unauthorized care "was entirely reasonable" given Dr. Mahoney's familiarity with Hunter's prior left hip injury, his familiarity with the treatment of that injury, and the "beneficial physician-patient relationship" he had established with Hunter. It found Mercy's choice to retain Dr. Mahoney's opinion regarding Hunter's disability further buttressed the determination the care he provided was reasonable, and noted Dr. Mahoney's care proved beneficial "as claimant was able to return to work, whereas under defendant-authorized care, claimant's restrictions prevented claimant from engaging in her pharmacy technician duties."

The district court questioned the agency's determination Dr. Mahoney's care was beneficial because it allowed Hunter return to work without restrictions, noting "beneficial refers to medically beneficial." However, the district court agreed Dr. Mahoney's treatment was more medically beneficial than the treatment provided by the authorized provider. We reach the same conclusion as the district court, and accordingly, we affirm.

**AFFIRMED.**