Thomas DUNLAP, Petitioner–
Appellee/Cross–Appellant,

v.

ACTION WAREHOUSE and Commerce
& Industry Insurance Company, Re-
spondents–Appellants/Cross–Appel-
lees.

No. 11–1451.

Court of Appeals of Iowa.

Oct. 17, 2012.

Aaron T. Oliver of Hansen, McClintock & Riley, Des Moines, for appellants/cross-appellees.

R. Saffin Parrish–Sams of Soldat & Parrish–Sams, P.L.C., West Des Moines, for appellee/cross-appellant.

Heard by EISENHAUER, C.J., and DOYLE and TABOR, JJ.

DOYLE, J.

Employer Action Warehouse and its workers' compensation carrier, Commerce & Industry Insurance Co. (hereinafter collectively referred to as "Warehouse"), appeal from the district court ruling on judicial review affirming in part and reversing in part the workers' compensation commissioner's decision. They contend the court erred in affirming the commissioner's findings that (1) Thomas Dunlap's elbow and back injuries were causally related to his work incident and (2) Dunlap was entitled to temporary disability/healing period benefits. Additionally, they assert (3) the court erred in reversing the commissioner's decision that Dunlap was not entitled to penalty benefits. Dunlap cross-appeals from the district court's affirmation of the commissioner's conclusion that the agency had no contempt power concerning Warehouse's expert's non-compliance with a subpoena and subpoena duces tecum. He also cross-appeals from the district court's ruling that limited the period of penalty benefits. We affirm in part and reverse in part.

### I. Background Facts and Proceedings.

In November 2005, Thomas Dunlap applied to work for Warehouse. On the application, he stated he was a high school graduate although he had only completed the ninth grade. Warehouse hired Dunlap shortly thereafter as a warehouse worker. He eventually was put "sort of in charge of production" in his work building. The job was very fast-paced, and it required Dunlap to occasionally bend, stoop, squat, climb, reach above shoulder level, crouch, kneel, push, pull, twist, turn, carry, and lift.

While employed by Warehouse, Dunlap admitted he was occasionally late to work ten or fifteen minutes in the winter months. He was never disciplined for tardiness. In April 2007, Dunlap received a disciplinary action for missing work without calling in.

On July 18, 2007, Dunlap sustained a work injury. While pulling a fifty-plus-pound box off a shelf, the pallet he was standing on broke. He fell backward into the raised forklift he had been using, "twisting, turning, and smashing the box into [him]." Dunlap's chest and back were both very red and sore. He attempted to go back to work, but was in a lot of pain. He reported the incident, and Warehouse asked him to see a particular doctor. Dunlap requested a different doctor, and Warehouse sent him to see Bern R. Boyett, M.D.

Dunlap saw Dr. Boyett a few hours after the incident. Dr. Boyett's notes state that Dunlap presented with the "chief complaint of pain in his left back and left lower portion of the neck." He observed Dunlap

had redness, swelling, and tenderness in his back, and he reported that bending and twisting of the neck caused Dunlap pain. He also noted that "using the left arm overhead was difficult" for Dunlap. He ultimately found Dunlap had a "back contusion/strain" that was work related, and he determined Dunlap could return to work with restrictions including no forklift truck driving, no overhead work, no lifting over twenty pounds, and no pushing or pulling on heavy items. He prescribed Dunlap a muscle relaxer and pain medication. He did not order any diagnostic tests or treatments on this visit. He scheduled an appointment for Dunlap to return in four to five days.

Dunlap saw Dr. Boyett on seven more occasions. On July 30, Dr. Boyett ordered Dunlap to enroll in physical therapy. Dr. Boyett's notes from the August 16 appointment noted Dunlap reported his pain was worse, stating the pain was disturbing his sleep and that he had leg pain. Dr. Boyett's notes further stated Dunlap was possibly experiencing side effects from the medication, and he discontinued Dunlap's medications. Dr. Boyett's August 27 notes state Dunlap reported he had felt a pop in his back while sitting at home, and he was generally feeling better, though his leg pain had continued when he returned to work and he had mild discomfort and tenderness in his back. On this visit, Dr. Boyett obtained an x-ray of the lumbosacral spine and reported it was unremarkable. He noted Dunlap was still symptomatic, with back and leg pain, and he ordered an MRI to be done. He discontinued physical therapy for Dunlap, finding it had not been helpful.

Dunlap last saw Dr. Boyett on September 11 for a recheck following his MRI. Dr. Boyett's notes state Dunlap reported only mild discomfort, though he had some generalized soreness all the time and sleep

issues. Dr. Boyett found the MRI was completely normal, and he assessed Dunlap as having "chronic back pain with apparent symptom magnification." Dr. Boyett discharged Dunlap from his care, and his notes state he "encouraged [Dunlap] to return to full duty" and to "increase [his] activities as able." His notes also state Dunlap was to follow-up as needed.

During the time period Dunlap saw Dr. Boyett, Dunlap continued to work at Warehouse, missing no work, except for doctor appointments, from the time of his incident until September 17. While working, Dunlap regularly complained to his manager and co-workers about Dr. Boyett's care, findings, and diagnoses. Dunlap told them Dr. Boyett would not listen to him about his condition and that Dr. Boyett did not believe him. When Dunlap was discharged from treatment by Dr. Boyett, he expressed to his manager and co-workers his surprise and dissatisfaction with the release. He asked his manager what he should do since he was still in great pain and was not given a satisfactory answer by Dr. Boyett. The manager referred him to Warehouse's human resources/workers' compensation manager. Dunlap asked her if he could see a different doctor and was told he could do so at his own expense.

On September 17 and 18, Dunlap called into work sick, stating he had a touch of stomach flu and back pain. He did not have a doctor's note. His manager talked with Warehouse's operational manager, and they "decided that [they] were getting along pretty good without [Dunlap] ... every time he was gone, so why did [they] need to keep [Dunlap] there any longer." When Dunlap returned on September 19, Warehouse terminated his employment for "excessive absenteeism and tardiness," though he had not been written-up for any absences or tardiness except the April

2007 write-up. In fact, Warehouse kept no records of any alleged absences or tardiness and admits Dunlap missed no work after the incident but for doctor's appointments. Warehouse did not advise him his absences and tardiness were a problem. In terminating his employment, Dunlap's manager told him, "I don't think your heart is in this." Dunlap subsequently applied for and was awarded unemployment benefits, despite Warehouse's resistance.

Dunlap continued to experience back pain. He attempted to do some work for his brother installing sheet rock, but could not continue beyond twenty minutes due to the pain. Dunlap did not seek medical help at that time because he had no insurance and believed he would be responsible for the expenses. After moving into a different home, Dunlap learned there was a free medical clinic nearby, and he sought treatment there.

At the clinic, Dunlap saw Nick Palmer, D.O., for his ongoing back, leg, and hand pain, and for his sleep issues. Dr. Palmer found in his examination that Dunlap had left radicular symptoms and diminished reflexes, sensory nerve deficit, lost range of motion, and complete numbness in the L4–L5 dermatomes. Dr. Palmer "felt ... [Dunlap] definitely needs some further follow-up" and referred Dunlap to Scott Neff, D.O., an orthopedic specialist. Dr. Palmer's referral letter to Dr. Neff stated, "I examined [Dunlap] after he was injured (by history) in an obvious workman's [compensation] situation."

Thereafter, Dunlap contacted the Iowa Division of Workers' Compensation (IWC) and spoke to an IWC claims administrator to learn if he had any rights to additional care. The administrator advised him he was entitled to an independent medical examination and alternate medical care. The administrator arranged a conference call with Warehouse's human resources/workers' compensation manager to determine whether additional care could be provided by Warehouse, and she advised there was nothing that Warehouse could offer at that time and would refer the matter to Warehouse's insurance carrier.

Dunlap obtained legal counsel and filed a petition for alternate medical care on April 16, 2008. On the day of the hearing, April 28, Warehouse set up an appointment for Dunlap to see Dr. Boyett that day. Dunlap stated at the hearing he did not want to see Dr. Boyett again because he had told Dunlap he had nothing further to offer him and he was not an orthopedic surgeon. Dunlap also stated at the hearing he was still experiencing severe pain and had numbness in his fingers on his left hand.

The deputy workers' compensation commissioner in that case entered its decision that same day, finding Warehouse had "admitted liability for an injury occurring on July 18, 2007." The deputy granted Dunlap's request for alternate care, explaining:

> The last notes of Dr. Boyett indicate he believed [Dunlap] was magnifying his symptoms. Return to care with Dr. Boyett would be pointless since he has already concluded [Dunlap] is magnifying his symptoms. [Dunlap] had pain at the time of the visit with Dr. Boyett and continues to have pain now. He has seen another physician who recommends consultation with an orthopedic specialist which has never taken place.

The deputy ordered Warehouse to provide Dunlap care with Dr. Neff and to "pay for such care including any recommendations this provider may make." The decision was not appealed.

Dunlap was examined by Dr. Neff in May 2008. Dr. Neff found Dunlap's previous MRI was normal, but found Dunlap's deep tendon reflexes showed diminished ankle jerk. He recommended another MRI as well as EMG studies of Dunlap's left leg and left upper extremity be performed. He noted in his report to Warehouse's insurance carrier that it was "impossible to make a specific diagnosis at this point." His letter further stated: "This far from injury, it is hard to know for certain what is related to what, and it might have made more sense, in retrospect, to do some of this workup more promptly. [Dunlap] says x-rays of his rib pain were not even taken for seven[1] weeks."

After the examination, Dr. Neff mailed Warehouse a copy of his report of Dunlap's examination. Dr. Neff included a letter, which stated:

> This far from injury, essentially one year, it is absolutely impossible to determine what current symptoms are related to an alleged injury, which allegedly happened one year ago. [Dunlap] does need further workup to try and explain his current symptoms, but there is no way to associate current symptoms with an injury this long ago.

Warehouse first challenged but ultimately authorized Dr. Neff's recommendations for the MRI and EMGs.

In June 2008, Dunlap filed his petition seeking workers' compensation benefits, and he saw Dr. Neff again on June 18, after Dunlap's studies were completed. The EMG study on Dunlap's left arm showed cubital tunnel syndrome and mild changes in his elbow, and Dr. Neff recommended surgery on Dunlap's arm. The EMGs were otherwise normal, as was the MRI. Dr. Neff recommended Dunlap be seen by a spine specialist concerning his continuing back pain.

Warehouse did not provide authorization for Dr. Neff's recommendations. On August 20, 2008, Warehouse sent Dr. Neff a follow-up letter stating: "Based on your opinions in [your] report, I assume that your current treatment recommendations are *not* causally related to the 2007 injury." Dr. Neff responded on September 26 that he agreed with the statements contained in Warehouse's letter based upon the information he had. However, Dr. Neff later clarified his opinion, stating "[w]hat I tried to say, obviously not very well, is that you cannot look at a MR scan and point to a date of injury . . . ." Dr. Neff agreed that, based upon Dunlap's history, Dunlap's ongoing back and left elbow symptoms were more likely than not causally related to Dunlap's 2007 work injury, but he reaffirmed he could not state within a reasonable degree of medical certainty that Dunlap's conditions were causally related to the 2007 work incident.

In October 2008, John D. Kuhnlein, D.O., an occupational medicine specialist, conducted an independent medical examination of Dunlap at Dunlap's counsel's request, spending two hours and forty minutes with Dunlap in obtaining his history and performing the examination, and another hour and a half reviewing Dunlap's medical records. Dr. Kuhnlein's report noted Dunlap expressed "a sincere desire to get better and go back to work, and frustration at what he views as a lack of appropriate medical care for his condition." Dr. Kuhnlein found Dunlap to be credible as he described his symptoms to him. He noted Dunlap reported that several of his previous injuries, including chest and shoulder contusions and cervical and thoracis strains, had resolved. Based upon

---

1. It was actually five weeks.

his examination of Dunlap, Dr. Kuhnlein diagnosed Dunlap with "[l]ow back pain with intermittent radicular symptoms. Possible radiculitis. Chronic musculoskeletal low back pain" and "[c]ubital tunnel syndrome left elbow." Dr. Kuhnlein opined that, within a reasonable degree of medical certainty, it was "probable that [Dunlap's] . . . work injury was a substantial factor in causing the . . . diagnoses." In reviewing the medical records, Dr. Kuhnlein observed that "Dr. Boyett's notes on occasion tended to disagree with the nurse's notes at clinic visits, and physical therapy notes." "Based on [Dunlap's] presentation [the day of his examination], and on comments that he made without prompting, regarding his desire to return to work and his desire to get better, and his frustration with the lack of care regarding his various medical issues," Dr. Kuhnlein believed Dunlap was telling the truth when he stated he had told Dr. Boyett of his ailments concerning his upper extremity and chest wall although Dr. Boyett never documented any complaints from Dunlap concerning those areas. Dr. Kuhnlein further opined:

> At this late date, I am not certain that there is any way to prove or disprove whether this actually occurred, and so again it becomes a belief question: who is more believable, [Dunlap], or the notes generated by Dr. Boyett. I choose to believe [Dunlap] at this time, as I have no reason not to.
>
> . . . If [Dunlap's] main goal was secondary gain with this claim, I would expect him to indicate that his symptoms had worsened and that all persisted after the injury. I would not expect him to have related that his neck, tho-

racic spine, left shoulder, and chest wall symptoms have essentially resolved.

Among other things, Dr. Kuhnlein recommended Dunlap see a pain specialist and that a CT scan with myelography be performed, including "views standing, as well as supine, to see if that might produce differences within his spine. . . ." He also recommended a second orthopedic opinion concerning treatment of his elbow. Dr. Kuhnlein assigned Dunlap an overall 11% whole person impairment as a direct result of his July 2007 work injury, and he set forth work restrictions for Dunlap.

In early 2009, Dunlap applied for and was approved for healthcare coverage through a state program. He began seeing Eric Thompson, D.O., who prescribed extensive physical therapy and medication. Dr. Thompson also found Dunlap's lower back and cubital tunnel conditions work-related. Dr. Thompson noted Dunlap continued to have difficulty with back and elbow pain, numbness in his hand, and an altered gait to the extent Dunlap was prescribed a cane.

In March 2009, Warehouse designated N. John Prevo, D.O., as their expert and scheduled an appointment for Dunlap. About three weeks before Warehouse's designation, the Iowa Board of Medicine (IBM) filed disciplinary charges against Dr. Prevo for "substance abuse which impairs his ability to practice medicine with reasonable skill and safety."[2] Dunlap initially challenged Dr. Prevo's qualifications because of the charges against him, but ultimately saw Dr. Prevo on March 19 at Warehouse's request.

---

2. The statement of charges filed by the IBM stated Dr. Prevo had tested positive for abusable medications and that Dr. Prevo had admitted to "using frozen urine samples and providing non-witnessed drug tests in an at-tempt to avoid detection of substance abuse." The statement also noted Dr. Prevo had previously been placed on probation for two years subject to substance abuse counseling and monitoring.

Accordingly to Dunlap, Dr. Prevo's examination lasted approximately fifteen minutes. Following the examination, Dr. Prevo opined that he could not state with any degree of medical certainty that Dunlap's complaints were related to his 2007 work injury. After observing Dunlap, he found Dunlap's range of motion to be "essentially normal" and, after watching Dunlap walk up and down a hallway with his cane, opined Dunlap had "a normal gait otherwise." Based on his findings of normality, Dr. Prevo did not use any measurement tools to further assess any limitations in Dunlap's range of motions. Dr. Prevo noted Dr. Boyett's notes did not reflect that Dunlap had reported any left upper extremity symptoms, and he opined Dunlap's elbow ailment was causally related to a left elbow contusion Dunlap had in 1994, though he admitted Dunlap had not reported any further elbow problems until his 2007 work incident. Dr. Prevo believed Dunlap was "at a point of maximum medical improvement." Both Dr. Kuhnlein and Dr. Thompson responded critically to Dr. Prevo's assessment of Dunlap and disputed his conclusions.

In preparing for the hearing, Dunlap's attorney caused Dr. Prevo to be served with a deposition subpoena and a subpoena duces tecum. No objections were made by Dr. Prevo or Warehouse to the subpoenas, nor was a protective order sought. When he appeared for his deposition, Dr. Prevo refused to provide certain subpoenaed documents pertaining to the current status of his medical license. Dunlap's attorney deposed Dr. Prevo. In addition to questions about his assessment of Dunlap, Dr. Prevo was questioned about his pending disciplinary charges with the IBM and the status of his medical license. Dr. Prevo refused to answer those questions on the advice of his personal attorney, including whether or not he had provided a urine sample the morning he examined Dunlap. Dr. Prevo

did agree that his capacity to make reasoned, sound judgments on the day he examined Dunlap was very relevant to his credibility but declined to provide any further information on that subject per the advice of his attorney.

The matter came before another deputy workers' compensation commissioner for hearing on May 5, 2009. Dunlap initially objected to use of Dr. Prevo's deposition in evidence, but later withdrew the objection and instead sought sanctions against Warehouse for Dr. Prevo's refusal to answer questions and provide the subpoenaed documents at his deposition.

Shortly after the hearing, the deputy filed his arbitration decision finding forcefully in favor of Dunlap. The deputy ordered Warehouse to pay the costs of Dr. Prevo's deposition, including the fees incurred for Dr. Prevo's and the court reporter's time. The deputy declined to award further sanctions against Warehouse, but found Dr. Prevo's refusal to answer questions concerning his charges called into question his credibility, and the deputy found greater weight should be given to the opinions of Dr. Thompson and Dr. Kuhnlein.

Relevant here, the deputy found the greater weight of the evidence showed Dunlap's low back, left leg, and left arm symptoms were caused by Dunlap's July 2007 work injury, Dunlap had clearly not reached maximum medical improvement, and Dunlap was in a running healing period. The deputy further found Dunlap's employment was terminated because he was unable to work due to his back condition caused by the work injury and was therefore entitled to temporary partial disability and healing period benefits. The deputy declined Dunlap's request for penalty benefits, finding Dr. Boyett's and Dr.

Neff's opinions made Warehouse's liability fairly debatable.

Warehouse appealed, and Dunlap cross-appealed the sufficiency of the deputy's sanction and penalty benefits determination to the workers' compensation commissioner. The commissioner affirmed the deputy's opinions, finding the deputy made accurate and complete findings of fact and agreeing with the deputy's conclusions of law. Warehouse and Dunlap then sought judicial review of the commissioner's ruling, essentially asserting the same challenges. The district court affirmed the commissioner's decision in all respects but one. The court determined Dunlap was entitled to penalty benefits from the date of his injury until September 26, 2008, the date Dr. Neff responded to Warehouse's letter agreeing his treatment recommendations were not casually related to the 2007 injury based upon his information, which made Warehouse's liability fairly debatable for the first time.

Warehouse appeals, and Dunlap cross-appeals.

## II. Standard of Review.

■ Iowa Code chapter 17A authorizes judicial review of the commissioner's decisions. Iowa Code § 86.26 (2009). When a district court reviews such a decision, it acts in an appellate capacity. *Winnebago Indus., Inc. v. Haverly*, 727 N.W.2d 567, 571 (Iowa 2006). It may grant relief if the agency has prejudiced the substantial rights of the claimant and if the agency action falls within any criteria enumerated in section 17A.19(10)(a)–(n). *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010). On review, we apply chapter 17A when determining whether we reach the same conclusions as the district court. *Hill v. Fleetguard, Inc.*, 705 N.W.2d 665, 669 (Iowa 2005). If our

conclusions align, we affirm; otherwise we reverse. *Id.*

## III. Warehouse's Appeal.

On appeal, Warehouse challenges the district's court ruling affirming the commissioner's findings that Dunlap's elbow and back injuries were causally related to his work incident and that Dunlap was entitled to temporary disability benefits. Additionally, Warehouse contends the court erred in awarding penalty benefits to Dunlap. We address its arguments in turn.

### A. Causation.

■ Warehouse contends the agency's findings that Dunlap's injuries were causally related to his 2007 work injury were not supported by substantial evidence. Central to Warehouse's causation argument is the agency's finding that Dunlap was a credible witness. Throughout its arguments, Warehouse attempts to discredit Dunlap's credibility and the agency's credibility finding, pointing out, among other things, that he lied on his work application, he occasionally drove without a license, he was charged in the past with public intoxication, he had not applied for disability benefits, and Dr. Boyett's notes evidence he never complained about any upper extremity injury. However, it is for the commissioner, as the finder of fact, to determine the credibility of the witnesses, weigh the evidence, and decide the facts at issue in a case. *See Arndt v. City of Le Claire*, 728 N.W.2d 389, 394–95 (Iowa 2007).

Upon our review of the record, we agree with the commissioner's apt conclusion concerning the issue of Dunlap's credibility:

The deputy was in the best position to assess the demeanor of [Dunlap] and thus judge his credibility. The deputy

found [Dunlap] to be credible despite the inconsistencies pointed out by [Warehouse].... Also, [Warehouse focuses] on [Dunlap's] past legal troubles, although [Dunlap's] legal troubles are less disconcerting than the similar troubles of their own witness to a large extent and [Warehouse argues] Dr. Prevo is a credible witness. It must be noted that none of the legal problems of [Dunlap] involved a crime of dishonesty or theft. Furthermore, [Dunlap's] accusations of mistreatment by [Warehouse] and medical providers do not imply a lack of credibility even if [Dunlap] was attempting to "shift the blame" as [Warehouse characterizes] it. [Dunlap] has not been provided with prompt and reasonable care to address his significant pain complaints and the basis of his termination from employment is questionable.

We agree with the agency's finding that Dunlap was credible, and we therefore find no error in the district court's affirmation of the credibility finding.

■■■ Medical causation presents a question of fact that is vested in the discretion of the agency. *See Dunlavey v. Econ. Fire & Cas. Co.*, 526 N.W.2d 845, 853 (Iowa 1995). We will therefore only disturb the commissioner's finding of medical causation if it is not supported by substantial evidence. *See* Iowa Code § 17A.19(10)(f). When a party claims the commissioner's finding is not based upon substantial evidence, the reviewing court must determine if a factual determination made by the commissioner "is not supported by substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(f). "Merely because we may draw different conclusions from the record does not mean the evidence is insubstan-

tial." *Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 251 (Iowa 2012).

■■■ As the finder of fact, the agency determines the weight to assign an expert opinion, assessing the accuracy of the facts provided to the expert as well as other surrounding circumstances. *Sherman v. Pella Corp.*, 576 N.W.2d 312, 321 (Iowa 1998). The agency may reject or accept the expert evidence entirely or in part. *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 850 (Iowa 2011). In our appellate posture, we " 'are not at liberty to accept contradictory opinions of other experts in order to reject the finding of the commissioner.' " *Id.* (citation omitted). Thus, whether a piece of evidence trumps another or is qualitatively weaker is not an assessment for either the district court or the court of appeals to make when reviewing an agency's decision on the basis of substantial evidence. *Arndt*, 728 N.W.2d at 394.

The deputy detailed why he gave greater weight to the opinions of Drs. Thompson and Kuhnlein than Dr. Prevo's opinion and the commissioner adopted that finding. Both Drs. Thompson and Kuhnlein opined that Dunlap's symptoms of arm/hand/elbow pain as well as his back pain were causally related to the 2007 work incident. Even Dr. Neff found Dunlap's injuries were more likely than not to have been caused by the 2007 work injury, although he could not say so for certain. Dr. Neff was particularly critical of the delay in Dunlap's "workup." We also note Warehouse accepted liability for Dunlap's back injury in the alternate medical care proceeding, and Dr. Boyett's notes evidence Dunlap was still in pain when Dr. Boyett released him from his care. Following our review of the whole record, we agree with the district court that there is substantial evidence in the record to support the commissioner's finding that Dun-

lap's physical condition was causally related to his work injury in July 2007. We therefore affirm on this issue.

### B. *Award of Temporary Disability and Healing Period Benefits.*

 Temporary disability benefits are governed by section 85.33, while healing period and permanent disability benefits are governed by section 85.34. *See Mannes v. Fleetguard, Inc.,* 770 N.W.2d 826, 830 (Iowa 2009). Generally, "[t]emporary total disability compensation benefits and healing-period compensation benefits refer to the same condition." *Clark v. Vicorp Rest., Inc.,* 696 N.W.2d 596, 604 (Iowa 2005). The purpose of both of these benefits is to "partially reimburse the employee for loss of earnings while the employee is recuperating from the condition the employee has suffered." *Id.* "[A]n award for healing-period benefits or total temporary disability benefits are only temporary benefits and do not depend on a finding of a permanent impairment." *Bell Bros. Heating & Air Conditioning v. Gwinn,* 779 N.W.2d 193, 200 (Iowa 2010).

 The type of benefit that is appropriate in a given situation depends upon whether or not the employee has a permanent disability. *Clark,* 696 N.W.2d at 604. "A person with a 'permanent disability' can never return to the same physical condition he or she had prior to the injury." *Armstrong Tire & Rubber Co. v. Kubli,* 312 N.W.2d 60, 65 (Iowa Ct.App. 1981). "Ordinarily, the determination of what label to place on temporary benefits must await the determination of whether some degree of permanent disability has been sustained by the claimant." *Pitzer v. Rowley Interstate,* 507 N.W.2d 389, 391 n. 1 (Iowa 1993). Whether an employee has a permanent disability cannot be determined until the employee has reached maximum medical improvement. *Bell*

*Bros.,* 779 N.W.2d at 201. Stabilization of the employee's condition "is the event that allows a physician to make the determination that a particular medical condition is permanent." *Id.* at 200.

 If an employee has a permanent disability, " 'the payments made prior to payment for permanency are healing period benefits.' " *Clark,* 696 N.W.2d at 604 (citation omitted). Healing period benefits are payable

> until the employee has returned to work or it is medically indicated that significant improvement from the injury is not anticipated or until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, whichever occurs first.

Iowa Code § 85.34(1); *see also Broadlawns Med. Ctr. v. Sanders,* 792 N.W.2d 302, 306–07 (Iowa 2010). Thus, healing period benefits run until the employee returns to work, is able to return to similar employment, or recuperates from the injury. *Pitzer,* 507 N.W.2d at 391. "The healing period may be characterized as that period during which there is a reasonable expectation of improvement of the disabling condition, 'and ends when maximum medical improvement is reached.' " *Armstrong Tire,* 312 N.W.2d at 65 (citation omitted).

 On the other hand, "[w]hen an injury does not result in a permanent disability, the payments made are called 'temporary total disability benefits.' " *Clark,* 696 N.W.2d at 604 (citation omitted). "Temporary benefits compensate the employee for lost wages until he or she is able to return to work, whereas permanent benefits compensate either a disability to a scheduled member or a loss in earning

capacity (industrial disability)." *Mannes,* 770 N.W.2d at 830.

 The agency determined Dunlap had not yet reached maximum medical improvement. Maximum medical improvement is related to "stabilization of the condition or at least a finding that the condition is 'not likely to remit in the future despite medical treatment.'" *Bell Bros.,* 779 N.W.2d at 200 (citation omitted). Prior to the time maximum medical improvement has been achieved, only temporary benefits are available. *Id.* at 201.

We conclude there is substantial evidence in the record to support the agency's determination that Dunlap was not truly returned to work by Dr. Boyett, and even if he was, he had not achieved maximum medical improvement at the time of the administrative hearing. Dr. Boyett returned Dunlap to work, but only in terms of "encouraged to return to full duty" and to "increase activities as able." We agree with the commissioner's conclusion that "[t]he weight of the evidence ... shows [Dunlap] should not have been released for full-duty work without restrictions on September 17, 2007." The district court's comments upon Dr. Boyett's so-called "full-duty release" were simply affirmation of the commissioner's previously-stated conclusions; it did not "grossly overstep[ ] its bounds" in commenting upon the evidence, nor did it ignore Iowa law.

Here, Dunlap attempted to work while injured, complaining to everyone around him about his pain and Dr. Boyett's treatment and release. He was told he would be responsible for the expenses if he saw someone other than Dr. Boyett, so saw no one. When he missed work because of the injury, he was fired. Warehouse did not explain Dunlap's right to an independent medical exam, but faults him for not seeking treatment until he learned of the free clinic, as well as not seeing Dr. Boyett

again, though he concluded Dunlap was magnifying his symptoms. Drs. Thompson and Kuhnlein opined Dunlap needed further medical care for his injuries from the 2007 work incident, and, despite Warehouse's assertions to the contrary, Dr. Kuhnlein imposed work restrictions upon Dunlap. We accordingly find no error in the district court's affirmation of the agency's award of temporary disability/healing period benefits, and we affirm on this issue.

### C. Award of Penalty Benefits.

 Warehouse also argues the district court erred in reversing the agency's determination that Dunlap was not entitled to penalty benefits under section 86.13. This challenge is to the ultimate conclusion made by the agency and is therefore a challenge to the agency's application of law to the facts. "[T]he commissioner's application of law to the facts as found by the commissioner will not be reversed unless it is 'irrational, illogical, or wholly unjustifiable.'" *Neal v. Annett Holdings, Inc.,* 814 N.W.2d 512, 518 (Iowa 2012) (citation omitted).

Penalty benefits are permitted under Iowa Code section 86.13, which provides, in pertinent part:

> If a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the workers' compensation commissioner shall award benefits in addition to those benefits payable under this chapter, or chapter 85, 85A, or 85B, up to fifty percent of the amount of benefits that were unreasonably delayed or denied.

Our supreme court has stated a reasonable cause or excuse exists

> if either (1) the delay was necessary for the insurer to investigate the claim or (2) the employer had a reasonable basis

to contest the employee's entitlement to benefits. A reasonable basis for denial of the claim exists if the claim is fairly debatable. A claim is fairly debatable when it is open to dispute on any logical basis. Whether a claim is fairly debatable can generally be determined by the court as a matter of law. The reasonableness of the employer's denial or termination of benefits does not turn on whether the employer was right. The issue is whether there was a reasonable basis for the employer's position that no benefits were owing. If there was no reasonable basis for the employer to have denied the employee's benefits, then the court must determine if the defendant knew, or should have known, that the basis for denying the employee's claim was unreasonable.

*Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 267 (Iowa 2012) (internal citations, alterations, and quotation marks omitted).

Warehouse argues, as the agency found, Dr. Boyett's "full-duty release" provided a reasonable basis for its position that no benefits were owing. The district court disagreed, concluding, because "Dr. Boyett's release was qualified by a recognition that [Dunlap] was still suffering from work-related injuries and could increase his activities as he was able to do so," it was not reasonable for Warehouse to believe no benefits were owed to Dunlap and should have so known. We agree with the agency.

Here, the commissioner concluded a penalty was not appropriate because Warehouse had "what was arguably a full-duty release from Dr. Boyett and thus [Dunlap's] absences were technically unexcused." The commissioner noted that Warehouse also had Dr. Neff's opinion "that [Dunlap's] back pain was not related to his work injury." Based upon these opinions, we agree there was a reasonable basis for Warehouse's position that no benefits were owing to Dunlap and therefore cannot conclude the agency's application of law to the facts as found by the commissioner to be irrational, illogical, or wholly unjustifiable. Accordingly, we conclude the district court erred in reversing the agency's denial of penalty benefits, and we reverse on this issue.

### IV. Dunlap's Cross–Appeal.

 Finally, we address Dunlap's cross-appeal. The district court found that penalty benefits should have been awarded from the date of injury until September 26, 2008. Dunlap contends it was error not to impose penalties for actions of non-payment of benefits after September 26, 2008. Having concluded the district court erred in reversing the agency's denial of penalty benefits, we need not consider Dunlap's contention.

Dunlap also challenges the affirmance of the agency's decision not to deem Dr. Prevo in contempt for non-compliance with a subpoena. Dunlap requested that Dr. Prevo be found in contempt for refusing to comply with the subpoena and subpoena duces tecum. On Dunlap's application for rehearing, the deputy commissioner ruled, "This agency lacks contempt power." In setting forth a procedural background in his appeal decision, the commissioner stated:

On April 15, 2009, [Dunlap] served a subpoena duces tecum on Dr. Prevo. Dr. Prevo appeared for his deposition and did not move to quash the subpoenas. Dr. Prevo did not comply with the subpoena in full, nor did he answer questions about his licensure. The doctor's refusal to answer was pursuant to advice from counsel.

The commissioner concluded:

The deputy denied the contempt request on the basis that the agency does

not have contempt power. Even if the agency has contempt power, ... it would not be appropriate to hold Dr. Prevo in contempt for asserting a statutory privilege afforded to him during the course of the investigation against him. Therefore, it is concluded that the deputy's refusal to find ... Dr. Prevo in contempt is affirmed.

On appeal, the district court addressed the issue as follows:

The court finds that the agency was correct in denying the contempt request on the basis that the agency does not have contempt power. The court agrees with [Warehouse] that the law in Iowa is well-settled that an administrative agency is without power to enforce subpoenas or to hold someone in contempt of court. The legislature, through its enactments, has determined that courts are the appropriate tribunals or officers authorized to punish for contempt. [Iowa Code section 665.4], outlining punishment for contempt specifically lists the courts and/or officers that can punish for contempt and what punishment is in a particular court. The legislature has not designated, by any statute that this court could find authority for, to an agency through its administrative law judge to make a finding of contempt or to punish for contempt. An agency cannot act unconstitutionally or in violation of statutory mandate or without substantial support in the record. *Churchill Truck Lines, Inc. v. Transp. Regulation Bd.*, 274 N.W.2d 295, 299 (Iowa 1979). Both the commissioner and the

deputy commissioner were correct in finding that the agency does not have contempt power.

We agree with this analysis by the district court.

While Dunlap concedes the agency does not have the power to impose civil punishment for contempt, he asserts the agency had the power to "deem" Dr. Prevo in contempt for his non-compliance.[3] We disagree.

Acts constituting contempt have been specifically defined by our legislature. Iowa Code section 665.2(4) provides:

The following acts or omissions are contempts, and are·punishable as such by any of the courts of this state, or by any judicial officer, including judicial magistrates, acting in the discharge of an official duty, as hereinafter provided:

. . .

4. Disobedience to any subpoena issued by *it* and duly served, or refusing to be sworn or answer as a witness.

(Emphasis added.) The "it" in subsection four necessarily refers to any of the courts of this state or any judicial officer, including judicial magistrates. *See* Iowa Code § 602.1101(7). The subpoenas in question were not issued by any court of the state, judicial officer, or judicial magistrate. Therefore, disobedience of the agency's subpoenas can not constitute an act of contempt as defined by section 665.2(4). The agency could not deem otherwise.

 Furthermore, administrative agencies, including the workers' compen-

---

**3.** Punishment for contempt is within the province of the courts. Iowa Code section 17A.13(1) states in relevant part:

Agency subpoenas shall be issued to a party on request. On contest, the court shall sustain the subpoena or similar process or demand to the extent that it is found to be in accordance with the law applicable to

the issuance of subpoenas or discovery in civil actions. In proceedings for enforcement, the court shall issue an order requiring the appearance of the witness or the production of the evidence or data within a reasonable time under penalty of punishment for contempt in cases of willful failure to comply.

sation commissioner, do "not possess common law or inherent powers, but only the powers which are conferred by statute." *Franklin v. Iowa Dep't of Job Serv.*, 277 N.W.2d 877, 881 (Iowa 1979). The express grant of powers to the workers' compensation commissioner is found in Iowa Code chapters 85, 85A, 85B, 86, and 87. Nothing in these statutory provisions grants the commissioner the power to deem a party in contempt for failure to comply with a subpoena. *See* 1990 Op. Iowa Att'y Gen. 75, 1990 WL 484878, at *3 ("[I]t does not appear that the Iowa Industrial Commissioner has a direct power of contempt, as do the workers' compensation administrators in some other jurisdictions. This authority would have to be specifically provided for by statute or the state Constitution. Specific authority to seek contempt in the district court is provided for with regard to subpoenas (section 17A.13(1)) and through the Attorney General with regard to bonds and notices for places of hazardous employment (sec-

tion 87.19). A party subject to the workers' compensation statutes cannot be found in contempt of the Industrial Commissioner." (internal citations omitted)). We find no error in the district court's affirmation of the agency upon this issue.

### V. Conclusion.

For all the reasons stated above, we reverse the district court's reversal of the agency's denial of penalty benefits, and we affirm the district court's ruling in all other respects.

**AFFIRMED IN PART AND REVERSED IN PART ON APPEAL; AFFIRMED ON CROSS-APPEAL.**