**IN THE COURT OF APPEALS OF IOWA**

No. 14-0239
Filed November 26, 2014

**MENARD, INCORPORATED and AMERICAN**
**ZURICH INSURANCE CO.,**
      Petitioners-Appellants,

**vs.**

**ALEN BAHIC,**
      Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Michael D. Huppert,

Judge.

An employer seeks reversal of the district court's ruling upholding the Iowa

Workers' Compensation Commissioner's award of benefits to an employee.

**AFFIRMED.**

Charles A. Blades and Cynthia S. Sueppel, of Scheldrup, Blades,

Schrock, Smith, Aranza P.C., Cedar Rapids, for appellants.

Nicholas W. Platt of Hopkins & Huebner, P.C., Des Moines, for appellee.

Heard by Mullins, P.J., and Bower and McDonald, JJ.

**BOWER, J.**

The workers' compensation commissioner found Alen Bahic suffered a sixty percent loss of earning capacity and also found Bahic achieved maximum healing from his injury in October 2012. The commissioner ordered Bahic's employer, Menard, Inc.,[1] to commence paying permanent partial disability benefits in October 2012. The district court upheld the agency action.

On appeal, Menard claims (1) Bahic's "healing period terminated in May of 2011" because he was not working in an "accommodated job" or a "light duty" job but had actually acquired a new permanent job and (2) "any award of permanent disability should commence" in May 2011. Menard also claims the district court erred in upholding the commissioner's industrial disability award. After our review, we agree with the district court. Accordingly, we affirm.

I. **Background Facts and Proceedings**

**A. Injury and Treatment.** Bahic was hired by Menard in February 2008. He is an immigrant without a high school diploma, and his English-speaking skills are better than his reading/writing skills. Bahic worked as a laborer in shipping and receiving—loading and unloading items, running forklifts, and doing manual lifting, including manually lifting items weighing from 100 to 200 pounds, such as household appliances. Bahic's pre-injury work history consisted almost entirely of physical labor from which he is now precluded as a result of his permanent work restrictions. On his initial job application Bahic was asked if he had been

---

[1] Zurich Insurance, Inc., the insurance carrier for Menard, joins Menard in this appeal. References herein to Menard include the insurance carrier.

convicted of a felony. Although he had been, he did not so indicate on the application form. Menard did not require a background check for this position.

Over two years into his employment,[2] on August 2, 2010, Bahic suffered a stipulated work injury to his low back while unloading a front-load washer from a high forklift. When his injury did not improve, Menard sent Bahic to the doctors at Mercy West, who diagnosed back strain, prescribed medications, and ordered work restrictions—no lifting over ten pounds. According to Menard's Exhibit Q, it paid Bahic temporary total disability benefits from January 6 to January 28, 2011.[3]

When Bahic still did not improve, he was referred to an orthopedic surgeon, Dr. Cassim Igram, who determined surgery was not warranted and who referred Bahic to a physiatrist (physical medicine and rehabilitation specialist). Dr. Igram also imposed significant work restrictions—no lifting over twenty

[2] Menard Exhibit P details Bahic's weekly payment record for the thirteen weeks prior to his injury and shows he was a hard worker. On top of his regular forty hours, Bahic worked overtime hours each week from May 8, 2010, to July 31, 2010: six hours on one week, seven hours on one week, eight hours on two weeks, nine hours on one week, ten hours on three weeks, eleven hours on one week, twelve hours on two weeks, and seventeen hours on two weeks—resulting in weekly hours ranging from forty-six hours to fifty-seven hours.

[3] Iowa Code section 85.33(1) (2011) states an employer "shall pay" temporary total disability benefits until the earliest of the employee (1) "has returned to work," or (2) "is medically capable of returning to employment substantially similar to the employment" at the time of the injury.

Temporary and healing-period benefits "refer to the same condition, but have separate purposes depending on whether the injury leads to a permanent condition." *Bell Bros. Heating & Air Conditioning v. Gwinn*, 779 N.W.2d 193, 200 (Iowa 2010) (citing *Clark v. Vicorp Rests., Inc.*, 696 N.W.2d 596, 604 (Iowa 2005)). "If the injury results in a permanent partial disability, payments made prior to an award of permanent partial disability benefits are healing-period benefits. If the award does not result in permanent disability, the payments are called total temporary disability benefits." *Id.* "Nevertheless, an award for healing-period benefits or total temporary disability benefits [does] not depend on a finding of a permanent impairment." *Id.*

pounds and avoidance of repetitive activity. Bahic continued to work in the shipping and receiving department at Menard, although on light duty and within the prescribed work restrictions.

Menard selected physiatrist Dr. Michael Munhall, who started treatment in February 2011 and provided Bahic with physical therapy, continued medications, and work restrictions—no lifting over ten pounds. Store manager Mike Goode transferred Bahic to the sales department. Bahic testified Menard provided him with a chair due to his inability to stand for long periods; he answered phones, helped customers, and helped with the product. Bahic enjoyed talking with the customers and liked the job. He was trying to work forty hours per week, but with his ongoing therapy, he was averaging thirty-five to forty hours per week. Bahic explained he was warned because his hours were not full time: "I was kind of getting in trouble, too, because—from human resource lady, because if you [are] not averaging forty hours, you [are] not full time, see, so I did get warned by her a couple of times."

Menard's answers to interrogatories, Menard Exhibit O, stated Bahic "worked light duty commencing February 2011 through the date of his termination July 1, 2011." Bahic's light-duty status is also recognized in Menard Exhibit Q, which shows Menard stopped paying temporary total benefits and started paying temporary partial benefits to Bahic on January 30, 2011. "'*Temporary partial benefits*' means benefits payable . . . to an employee because of the employee's temporary partial reduction in earning ability as a result of the employee's temporary partial disability." Iowa Code § 85.33(2).

"Temporary partial disability" is the "condition of an employee for whom it is medically indicated that the employee is not capable of returning to employment substantially similar to the employment . . . engaged [in] at the time of injury, but is able to perform other work consistent with the employee's disability." *Id.* § 85.33(2).

On May 1, 2011, Bahic was formally transferred to the building materials department as a sales representative. After the transfer Menard continued to pay Bahic temporary partial disability benefits because his weekly earnings in this sales position did not equal his weekly earnings at the time he was injured. Each week, Menard calculated the reduction in earnings and paid Bahic the difference. The weekly payments to Bahic starting with his May 8, 2011 check and thereafter were: $66.22, $107.61, $109.40, $26.03, $177.10, $168.42, $122.29, with a final check before his July 1, 2011 termination of $178.16. *See Mannes v. Fleetguard, Inc.*, 770 N.W.2d 826, 830 (Iowa 2009) (providing "[t]emporary benefits are ordinarily established by direct evidence of actual wage loss."); *see also* Iowa Code § 85.33(4) ("The temporary partial benefit shall be [a statutory] percent of the difference between the employee's weekly earnings at the time of injury . . . and the employee's actual gross weekly income from employment during the period of temporary partial disability," i.e., during the period Bahic is not medically capable of returning to employment substantially similar to his pre-injury employment).

When Dr. Munhall's treatments did not alleviate Bahic's symptoms, Dr. Munhall referred Bahic to Dr. Matthew Biggerstaff, a pain management specialist,

who started treating Bahic on May 11, 2011. Over several months, Dr. Biggerstaff gave Bahic a series of epidural and trigger point injections.

Goode thought Bahic showed promise as a salesperson after his transfer to the building materials department. When an opening for an outside sales representative became available, Goode encouraged Bahic to apply because the job was within Bahic's physical restrictions[4] and would potentially increase his compensation. For this job Menard required a criminal background check due to the amount of contact with outside customers. After Bahic submitted the paperwork for the background check but before the results came back, Bahic sought out Goode and told him there "might be a problem" due to his previous felony conviction.

Eventually, Menard terminated Bahic's employment for falsifying his initial job application. Bahic's last day was July 1, 2011. Recognizing the change in Bahic's compensation status caused by the termination, on July 3, 2011, Menard changed Bahic's weekly compensation payments from temporary partial disability to temporary total disability—an unvarying $427.91 per week.

Dr. Biggerstaff's initial injections did not improve Bahic's condition. After Bahic's August 17, 2011 appointment with Dr. Munhall, he opined Bahic had achieved maximum medical improvement (MMI). Dr. Igram "apparently" concurred in this assessment,[5] as did Dr. Carlstrom.

---

[4] While there was some loading and unloading required in the outside sales job, Goode assured Bahic he would not have to do those tasks because Menard would provide help for the loading and unloading.

[5] We state Dr. Igram "apparently" concurred because the exhibit supporting this contention is not included in the administrative record. Nevertheless, Dr. Carlstrom

Based on the medical opinions, Menard stopped paying Bahic temporary total disability benefits and on August 17, 2011, converted the payments to permanent partial disability benefits. *See* Iowa Code § 85.34(1) (stating if an employee has suffered an injury causing permanent partial disability, the employer shall pay healing period benefits until "the employee has returned to work," or the employee is at MMI, or "the employee is medically capable of returning to" substantially similar employment as the employee's time-of-injury employment, "whichever occurs first"); *see also id.* § 85.34(2) ("Compensation for permanent partial disability shall begin at the termination of the healing period.").

We note at the hearing, Menard urged the deputy to find the date of August 17, 2011, was the conversion date for the start of permanent partial disability benefits. However, Dr. Biggerstaff was still treating Bahic, giving him another injection in September 2011. When improvement still did not occur, Dr. Biggerstaff recommended Bahic use a spinal cord stimulator (SCS). In February 2012 Dr. Biggerstaff opined Bahic was at MMI but continued to recommend a SCS trial, which occurred in March after Menard approved it. Based on the results, Dr. Biggerstaff concluded further SCS treatment was not warranted.

At the request of Menard, Dr. Mooney evaluated Bahic in August 2012. Dr. Mooney opined Bahic had not achieved MMI and suggested additional courses of treatment. Also in August 2012, Dr. Biggerstaff recommended Bahic undergo a medical branch block with possible radiofrequency ablation.

---

stated he reviewed Dr. Igram's conclusions and agreed with him that MMI occurred on August 17, 2011. Both the commissioner and the district court decisions note the missing exhibit but also note Dr. Igram's opinion is not disputed by Bahic. Also, both decisions reference Dr. Igram's opinion.

In a September 2012 letter, Dr. Biggerstaff opined that due to the intervening treatment, which occurred after his February MMI opinion, Bahic had not achieved MMI as of September 2012. Dr. Biggerstaff also opined that until the last treatment modality was done, Bahic would not achieve MMI. Also in September 2012, Bahic obtained employment selling used cars at Hyundai. Although he had actively looked for work, this was his first job after his termination.

After the final medical procedure was performed by Dr. Biggerstaff, he opined Bahic was at MMI as of October 8, 2012. Dr. Mooney concurred. At the hearing, Bahic urged the deputy to find October 8, 2012, was the conversion date for the commencement of permanent partial disability benefits.

**B. Hearing Report**. Prior to the hearing, the parties filled out a hearing report that stipulated to the matters in agreement and stated the disputed issues. The parties stipulated to: (1) an employer-employee relationship, (2) the date of injury (8/2/2010), (3) the "injury is a cause of temporary disability during a period of recovery," (4) the "injury is a cause of permanent disability," and (5) the "injury is an industrial disability." The hearing report listed the following issues relevant to this appeal as issues in dispute:

1. Is the claimant entitled to either temporary total disability, temporary partial disability, or healing period benefits from July 1, 2011, through the hearing date, i.e., current and running benefits?

2. Is the commencement date for permanent partial disability benefits, if any are awarded, "the 17th day of August, 2011 per Drs. Munhall, Igram, and

Carlstrom" [Menard position] or is the commencement date October 8, 2012, "per Drs. Biggerstaff and Mooney" [Bahic position]? [6]

3. Did Bahic's July 1, 2011 termination constitute a refusal of suitable work under Iowa Code section 85.33(3)?

**C. October 15, 2012 Hearing.** Prior to the testimony, the attorneys and the deputy had a lengthy discussion on the record:

> BAHIC ATTORNEY: . . . The MMI has been reached. I don't think the employer would agree to [Dr. Biggerstaff's MMI date of October 8, 2012.] I don't know if you would or not, but . . . .
> MENARD ATTORNEY: No. *We'd still assert that the MMI date should be . . . August 17, 2011*, when Dr. Munhall, Igram, and Carlstrom said he was at MMI.
> THE DEPUTY: So the only stipulation is that he's at MMI.
> MENARD ATTORNEY: *By one of those two MMI dates.*

(Emphasis added.) The parties presented their witnesses. At the close of evidence, the deputy stated: "Okay. We need to probably change this hearing report, because there is a stipulation—both parties stipulate Claimant at MMI, date disputed. Right?" Both attorneys concurred. The deputy set the schedule for post-hearing briefs.

Consistent with the stipulations in the hearing report, Menard did not claim in its post-hearing brief that Bahic should be converted to permanent partial disability benefits in May 2011. Rather, Menard asserted the deputy should set the conversion date to permanent partial disability benefits on August 17, 2011. Menard also asked the deputy to follow its October functional capacities

---

[6] We note the hearing report does not list an issue regarding benefits Menard paid to Bahic *prior to* July 1, 2011. Menard now argues its payments should have converted to permanent benefits as of May 1, 2011.

evaluation (FCE)[7] and claimed Bahic's industrial disability was 15-20%. Menard

sought "credit against any permanent disability award for all of the weekly

benefits that have been paid since the August 17, 2011 MMI date." Finally,

Menard's brief to the deputy stated:

> [T]hree different physicians—two of them treating physicians—have opined that claimant reached MMI as of August 17, 2011, *when defendants converted the payments to permanency* . . . .
> . . . With claimant at MMI, this renders moot all issues as to whether claimant is entitled to additional healing period benefits. Nonetheless, [Menard] contends that claimant is *not entitled to healing period benefits because he was terminated for misconduct [on July 1] that was tantamount to refusal to perform offered work.*

(Emphasis added.)

**D. Agency Decisions.** In his ruling, the deputy noted the parties'

agreement at the hearing that Bahic had achieved maximum improvement:

> When the hearing report was initially submitted to me at hearing, claimant was seeking in the alternative a running award or a permanency award . . . . After a discussion with the parties, the claimant agreed with defendants that claimant had achieved [MMI] but the parties disagreed as to when it occurred. *The factual issue of when claimant achieved maximum healing was then submitted to me.* Defendants believe the date was August 17, 2011. Claimant believes that date to be October 8, 2012.

(Emphasis added.) The deputy detailed why he found Bahic to be a credible

witness. The deputy concluded Bahic achieved medical stability, MMI, in

October 2012. While acknowledging the other opinions as to MMI, the deputy

selected Dr. Biggerstaff's date because he "was the authorized treating physician

---

[7] Bahic's October 5, 2012 FCE showed him capable of working at the light sedentary level and lifting up to fifteen to twenty pounds, depending on the range of the lift. Dr. Mooney's supplemental report agreed with the FCE and stated Bahic could return to full time work consistent with the FCE restrictions.

and his most recent views are controlling." The deputy ruled Bahic's work injury resulted in a permanent physical impairment of between 5-8% to his body as a whole.

As for industrial disability, the deputy found the work injury had restricted Bahic to a "light physical demand level" as shown in Menard's October FCE. Thus, Bahic "is capable of light duty work" and "his current limitations are solely due to the injury at Menard." The deputy ultimately concluded, based on Bahic's unique factors of disability, the work injury had resulted in a 60% loss of earning capacity. The deputy also ruled:

> Given the finding that claimant achieved maximum healing from his injury on October 8, 2012, claimant is entitled to healing period benefits from July 1, 2011 [termination] through October 8, 2012, and permanency benefits shall commence on October 9, 2012. [Menard's] argument that claimant's termination for cause constitutes an intentional refusal of suitable work, which bars any recovery for healing period benefits [from July 1 to MMI] under Iowa Code section 85.33(3) is not current agency precedent.

The deputy order Menard to pay Bahic (1) permanent partial disability benefits commencing in October 2012 and (2) healing period benefits from July 1, 2011, until the commencement of permanency benefits in October 2012.

Menard appealed to the commissioner, challenging "the commencement date for permanent partial disability benefits." Menard asserted Bahic: (1) "returned to work at Menard's with restrictions on January 30, 2011"; (2) "started working full time in the building materials department, in a sales job, a job he did for six months and which he liked, [h]e was working 35-40 hours a week"; (3) was "formally transferred" by Menard on May 1, 2011, "into the full time sales position in the building materials department"; and (4) was placed by Dr. Munhall "at

maximum medical improvement as of August 17, 2011." Menard claimed Bahic's

industrial disability "cannot be any more than 30 to 35 percent." Additionally:

> **The Commencement Date for Permanent Partial Disability is August 17, 2011.**
> The commencement date for permanent partial disability in this case is the date of maximum medical improvement set by Dr. Munhall, and agreed to by Dr. Igram and Dr. Carlstrom, August 17, 2011. As of this date, no further significant improvement from the work injury was anticipated. All conservative treatment measures had been exhausted. Ratings of permanent impairment could be and were assessed.
> Further, the claimant had by this time returned to work. He had been working full time at Menard's at least since being transferred into the sales position in the building materials department in May 2011. This return to work terminated the healing period. Iowa Code section 85.34(1). To the extent not terminated by then, healing period was terminated when Dr. Munhall, claimant's primary treating physician, concluded claimant had exhausted all treatment measures and was at MMI.

In August 2013 the commissioner summarily affirmed and adopted the deputy's

decision as the agency decision.[8]

    **E. District Court.** Menard appealed to the district court and advanced

the identical arguments made to commissioner and quoted above. The district

court affirmed the commissioner's decision:

> *The parties agree that Bahic was not eligible for healing period benefits after he returned to work on a light duty basis* . . . . [H]owever, he may have re-qualified for such benefits over a period of time after he returned to work, if he once again became ineligible. The court is satisfied that this resumption would have occurred after Bahic was terminated on July 1, as this termination on the part of Menard would equate with an inability on its part to offer Bahic suitable work. As of the date Bahic was terminated, it is undisputed that no practitioner had concluded that he was at MMI; further, there is no dispute that as of July 1, 2011, Bahic was unable to return to the work he engaged in prior to his work injury.

---

[8] The commissioner corrected scrivener's errors. This correction was noted and adopted by the district court. The correction is not at issue in this appeal.

> *Accordingly, the only issue regarding healing period benefits appears to be not whether they properly resumed after he was terminated, but through what date they should run.* This, in turn, is dependent on what date the commissioner determined Bahic to have achieved MMI; as long as that date is supported by substantial evidence, the fact that other earlier dates are possible is not grounds for reversal.

(Citations omitted and emphasis added.)  This appeal followed.

## II. Scope and Standards of Review

"The Iowa Administrative Procedure Act requires the district court to review agency action when a party invokes the district court's jurisdiction." *Gits Mfg. Co. v. Frank*, ___ N.W.2d ___, 2014 WL 5286513, at *2 (Iowa 2014).  Upon the district court's review, it "may reverse or modify an agency's decision if the agency's decision is erroneous under a section of the Act and a party's substantial rights have been prejudiced." *Id.*  When this appellate court reviews a district court decision reviewing an agency action, our task is to determine if we would reach the same result as the district court in applying the Act.  *See id.*  "If our conclusions align, we affirm; otherwise we reverse." *Dunlap v. Action Warehouse*, 824 N.W.2d 545, 554 (Iowa Ct. App. 2012).

In resolving the "issue of whether substantial evidence supports the agency's findings," the district court and this appellate court "can only grant relief" when "a determination of fact by the agency 'is not supported by substantial evidence in the record before the court when that record is viewed as a whole.'" *Gits*, 2014 WL 5286513, at *2 (quoting Iowa Code § 17A.19(10)(f)).  "Substantial evidence supports an agency's decision even if the interpretation of the evidence may be open to a fair difference of opinion." *Id.*  (citing *Arndt v. City of Le Claire*,

728 N.W.2d 389, 394-95 (Iowa 2007) ("It is the commissioner's duty as the trier of fact to determine the credibility of the witnesses, weigh the evidence, and decide the facts in issue.")). Accordingly, the district court and this appellate court "should not consider the evidence insubstantial merely because the court[s] may draw different conclusions from the record." *Id.* (reversing the lower court's ruling that substantial evidence did not support the agency's finding); *see Arndt*, 728 N.W.2d at 394 ("Making a determination as to whether evidence 'trumps' other evidence or whether one piece of evidence is 'qualitatively weaker' than another piece of evidence is not an assessment for the district court or the court of appeals to make when it conducts a substantial evidence review of an agency decision.").

Further, we recognize the "[a]pplication of workers' compensation laws to facts as found by the commissioner is clearly vested in the commissioner." *See Midwest Ambulance Serv. v. Ruud*, 754 N.W.2d 860, 864 (Iowa 2008). Therefore, we reverse only "upon a showing the commissioner's application of law to the facts of this case meets the demanding 'irrational, illogical, or wholly unjustifiable' standard of section 17A.19(10)(m)." *Id.* at 865.

## III.   Healing Period Benefits and Conversion to Permanency Benefits

Despite the stipulations in the hearing report, the statements of counsel on the record, and the statements of the deputy clarifying the hearing issues both before and after the evidence, on appeal Menard claims (1) Bahic returned to work full time in May of 2011 and thus his "healing period terminated in May of 2011," and (2) "any award of permanent disability should commence" in May

2011. Menard also claims the commissioner's ruling commencing permanency benefits in October 2012 "represents an irrational, illogical, or wholly unjustifiable application of law to facts."

**A. Applicable Law.** "Normally, an industrial disability gives rise to a period of healing accompanied by loss of wages." *Gwinn*, 779 N.W.2d at 200. During the period of healing, "temporary benefits are payable to the injured worker." *Id.* In general, the temporary benefits attempt to replace lost wages and to provide medical care. *Id.*

"An employee is entitled to receive temporary partial benefits when the employee is temporarily, partially disabled and accepts suitable work consistent with [his] disability." *Mannes*, 770 N.W.2d at 830. Employers pay temporary partial benefits "'because of the employee's temporary partial reduction in earning ability as a result of the employee's temporary partial disability.'" *Id.* (quoting Iowa Code § 85.33(2)).

> Permanent benefits and temporary benefits are very different. Temporary benefits compensate the employee for lost wages until he or she is able to return to work, whereas permanent benefits compensate . . . a loss in earning capacity (industrial disability). Permanent partial industrial disability benefits measure the extent to which the injury impairs the employee in the ability to earn wages. Conversely, temporary partial benefits are designed to reimburse the employee while he or she was temporarily disabled and still working for the employer (albeit in a different position). Temporary benefits are ordinarily established by direct evidence of actual wage loss.
> . . . There is no need to apply case law on permanent disability benefits from section 85.34 to define "temporary partial reduction in earning ability" under section 85.33. Section 85.33 clearly defines the purpose of temporary partial benefits and subsection (4) sets forth a formula for calculating temporary partial benefits, based on actual reduction of income. Thus, as a matter of

law, temporary partial benefits cannot be awarded where there has been no reduction in income.

*Id.* at 830-31 (citations and internal quotation marks omitted).

"Any disability that remains after stabilization of the condition gives rise to either a permanent partial or a permanent total award. In other words, maximum physical recovery marks the end of the temporary disability benefits, and at that point, any permanent disability benefits can be considered." *Gwinn*, 779 N.W.2d at 200.

**B. Analysis.** Menard contends "the district court like the commissioner failed to recognize that [Bahic,] at the time of his termination, was not working in a temporary "light duty" job or an "accommodated" job, but had actually acquired a new permanent job.

As recognized by the district court, Bahic did not claim entitlement to healing period benefits for the time he worked in the sales department. *See Staff Mgmt. v. Jimenez*, 839 N.W.2d 640, 658 (Iowa 2013) ("Healing period benefits are not payable when an employee returns to work."). However, it is undisputed "an employee may receive temporary partial disability benefits if he or she returns to work and receives a reduction in wages from what he or she earned prior to the injury."[9] *Id.* (citing *Mannes*, 770 N.W.2d at 830). This is what happened when Bahic returned to work, including the weeks after May 1, 2011.

---

[9] Bahic testified he had averaged fifty hours per week when he was in shipping and receiving. After the injury, Menard cut the fifty-cent-per-hour bump he had earned for running the forklift because he could not run the forklift. As expected, the amount of Bahic's weekly check for temporary partial benefits varied. Iowa Code section 85.33(4) required Menard to pay a set percent of "the difference between the employee's weekly earnings at the time of injury" and "the employee's actual gross weekly income from employment during the period of temporary partial disability."

Menard's payment log fully confirms this reality—Bahic was entitled to and received temporary partial disability benefits. In fact, Menard's answers to interrogatories and payment records rebut its own argument and show Menard recognized Bahic was, in fact, in a job with a reduction in wages in May and June 2011—Menard paid Bahic temporary partial disability benefits during that time because he was "entitled to receive temporary partial benefits when [he was] temporarily, partially disabled and [had accepted] suitable work consistent with [his] disability." *See Mannes*, 770 N.W.2d at 830. Each week from February through June 2011, Menard calculated its payment of temporary partial benefits based on Bahic's reduced income as compared to his pre-injury income. *See id.* (stating temporary benefits are "established by direct evidence of actual wage loss"). In conclusion, the reduction in Bahic's wages entitling him to temporary partial disability benefits clearly shows Bahic worked in a job with reduced wages in May and June 2011.

**C. Commencement Date for Permanent Disability Payments.** Menard argues "any award of permanent disability should commence as of" May 1, 2012.

Whether an employee has a permanent disability cannot be determined until the employee has reached maximum medical improvement. *Gwinn*, 779 N.W.2d at 201. Stabilization of the employee's medical condition "is the event that allows a physician to make the determination that a particular medical condition is permanent." *Id*. at 200.

At hearing, Menard's counsel asked the deputy to find Bahic's condition stabilized on August 17, 2011, with Menard's accompanying obligation to pay

permanency benefits starting on that date.[10] The manner in which the parties conducted the hearing is consistent with the deputy's understanding that the issue before him was whether the commencement date for permanent partial disability benefits is "the 17th day of August, 2011 per Drs. Munhall, Igram, and Carlstrom" [Menard position] or October 8, 2012, "per Drs. Biggerstaff and Mooney" [Bahic position]. *See Jimenez*, 839 N.W.2d at 657. Menard did not present any evidence that permanency benefits should commence at a date other than the date it claimed Bahic reached MMI and no doctor found Bahic's condition had stabilized in May of 2011. Menard's payment record shows it, *in fact*, converted Bahic to permanency benefits in August 2011 and not in May 2011. Therefore, we find no merit to Menard's claim permanent benefits should commence in May 2011.

Accordingly, we agree with the district court's decision (1) substantial evidence supports the commissioner's determination Bahic reached MMI in October 2012, and (2) "finding another date for MMI on this record would constitute an improper weighing of the evidence." *See Westling v. Hormel Foods Corp.*, 810 N.W.2d 247, 254 (Iowa 2012). Finally, we are not persuaded the commissioner's ruling represents an irrational, illogical, or wholly unjustifiable application of law to facts.

---

[10] At hearing, Menard's counsel asked the deputy to find that Bahic's termination constituted a refusal of suitable work *and for that reason*, healing period benefits were not owed on and after Bahic's July 1, 2011 termination to the point of MMI and permanency on August 17, 2011.

**IV. Industrial Disability**

Menard claims the district court erred in upholding the commissioner's finding of sixty percent industrial disability, contending the commissioner's determination must be reversed because it is not supported by substantial evidence and involves an irrational, illogical, and wholly unjustifiable application of law to fact. It contends (1) Bahic's motivation to return to work is questionable, (2) the commissioner "ignored the overwhelming evidence that [Bahic's] employment status after July 2011 was primarily attributable to his criminal record," and (3) the commissioner also ignored the fact Bahic "was employed in a new job position in which he was particularly well suited" before his criminal record was uncovered.

Bahic responds the commissioner appropriately evaluated his job prospects according to the consistent and extensive job search he performed. Thus, even if his "short experience in building sales would qualify him for other similar jobs, he was unable to find one of those jobs for over fourteen months even while exhibiting high motivation to work." Thus, Menard's speculation as to a possible and conceivable job market for Bahic "should not receive any consideration when compared to the actual facts of the case and the actual difficulty" he "had in finding a job." Second, Bahic notes the district court correctly and succinctly addressed this issue by noting the conviction was a factor he brought to the workplace before the work injury and cannot be used as a reason to mitigate industrial disability after the injury.

Turning to the district court's ruling, we note its conclusion: "The commissioner's determination [Bahic] sustained a 60% loss of earning capacity from his work injury was both supported by substantial evidence and not the result of irrational or illogical reasoning." When we combine our review of the record with Menard's challenges, Bahic's responses, and the district court's well-reasoned opinion, we agree with the district court. *See Gits Mfg.*, 2014 WL 5286513, at *2 ("The reviewing court only determines whether substantial evidence supports a finding according to those witnesses whom the commissioner believed."); *Dunlap*, 824 N.W.2d at 554 (stating if our conclusions align with the district court, we affirm). No purpose would be served by restating the district court's thoughtful and comprehensive analysis. Accordingly, we affirm.

**AFFIRMED.**